[No. S023835. Dec. 9, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
JESSE MORRISON, Defendant and Appellant.

COUNSEL

John L. Dodd and Robert F. Landheer, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Juliet H. Swoboda, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BAXTER, J.**—Defendant Jesse Morrison was convicted by a jury of one count of first degree murder (Pen. Code, § 187, subd. (a)),[1] one count of second degree robbery (§ 211), one count of first degree burglary (§ 459), and two counts of attempted murder (§§ 664, 187, subd. (a)). The jury found true the special circumstances that defendant committed the murder while engaged in burglary and robbery (§ 190.2, subd. (a)(17)) and found true the allegation that defendant personally used a firearm in the commission of the murder (§§ 1203.06, subd. (a)(1), 12022.5). At the penalty phase of trial, the jury returned a verdict of death. Appeal to this court is automatic. (§ 1239, subd. (b).)

We find no prejudicial error at the guilt or penalty phase of defendant's trial. We therefore affirm the judgment in its entirety.

## I. FACTS

### A. The Guilt Phase

Lourdes Cardenas lived on Marine Avenue in Wilmington with her four-month-old daughter Natalie, her 22-year-old brother Cesar Cardenas, and her mother Maria Cardenas.[2] In the early morning hours of May 11, 1989, defendant and three others invaded the Cardenas home and demanded money at gunpoint. After Lourdes handed over money and jewelry, the intruders fired their weapons, leaving Cesar fatally wounded and Lourdes seriously injured.

#### 1. The Prosecution Case

In 1989, Lourdes worked as a pharmacy technician at a hospital. Cesar operated a printing business out of the family home.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] For the sake of brevity, we will sometimes refer to the individual members of the Cardenas family by their first names only.

At approximately 8:00 p.m. on May 10, 1989, defendant came to the Cardenas home with one other person to discuss a printing job with Cesar, who was not home. Defendant, who identified himself as "Jesse," and the other person told Lourdes they would come back later.

Around 9:00 or 9:30 p.m., defendant returned to the Cardenas home with Michael Berry, Michael's brother Shawn Berry, and a teenage boy named Nathan. Lourdes knew the Berry brothers from her previous neighborhood in Carson, and the brothers knew her other brother, Alex Cardenas. Cesar, who was then home, took the four visitors to the garage, where he kept his printing press. All five eventually went inside the house and talked. Shawn Berry had something to eat.

While the four visitors were in the kitchen, Alex telephoned the house. He spoke with Lourdes and then with Michael Berry. Afterwards, Shawn Berry used the telephone to order a pizza. The four left the house about 25 to 30 minutes after they had arrived.

That night Lourdes was awakened from her sleep when, sometime after midnight, she heard Cesar call her name. Seeing a man in her house, Lourdes got out of bed, grabbed Natalie from her crib, and walked toward her open bedroom door. There were three men in the lighted hallway: Michael Berry, Nathan, and defendant. Michael Berry was standing with a gun by the door to Lourdes's bedroom. Defendant and Nathan had guns and were in the hallway between Lourdes's and Cesar's bedrooms. Shawn Berry was standing in the living room. According to Lourdes, the intruders were "demanding money and telling us to just not do anything stupid and to give them what they wanted."

At some point, defendant went into Lourdes's room and "shuffled things around." He then directed Cesar into his bedroom, followed him in, and shut the door. Meanwhile, Lourdes opened a yellow canister in her bedroom and gave Michael Berry $2,000 in cash that she had earmarked to pay the hospital bill for the birth of her baby. She also handed over jewelry from a box on her dresser.

While standing in her bedroom doorway, Lourdes heard gunshots from Cesar's bedroom. Defendant exited the bedroom, and Lourdes could see Cesar lying on his bed. Both defendant and Michael Berry then fired their guns at Lourdes, who was carrying Natalie. Lourdes was hit in the head and chest, but she managed to throw her baby safely to the floor.

Lourdes's mother, Maria, was asleep in her bedroom when the intruders came. She heard voices and got up. Upon opening her bedroom door, Maria

saw men with guns demanding money. One was aiming a gun at Lourdes, who was holding baby Natalie. Then one man pointed a gun at Maria, directed her to lie down on the bed in her bedroom, and repeatedly ordered her to stay there and not move. Maria jumped behind her bed when she heard shots fired. Subsequent examination of Maria's bedroom showed a row of bullet holes in a straight line from one edge of the bed, across the sheets and mattress, and into the edge of a dresser.

After the four intruders left, Lourdes called 911. She checked on Natalie and her mother; they were not physically harmed. Cesar, however, was lying motionless on his bed. A neighbor, John Hernandez, came running to the Cardenas house after hearing screams and gunshots. He tried to stop Lourdes's bleeding with rags, and called 911.

Sergeant Gary Twiford of the Los Angeles Police Department arrived at the Cardenas residence at approximately 12:30 a.m. on May 11, 1989. He saw Hernandez comforting Lourdes, who appeared to have gunshot wounds to the face and chest. Sergeant Twiford recalled that Lourdes "looked like she was going to lapse into unconsciousness or else going to die right on the spot."[3] He asked Lourdes who was responsible for the shooting. She responded: "Shawn Berry, Michael Berry and a male Negro by the name of Jesse."

Sergeant Twiford looked through the house and entered Cesar's bedroom. Cesar was lying on the bed, facedown, with a pillow marked by two bullet holes resting over his head. Cesar had been shot in the head and appeared lifeless. He died later that morning at 9:14 a.m.

Los Angeles Police Detectives Richard Marks and Richard Simmons investigated the Cardenas case. There were no signs of a forced entry into the residence. Bullets, bullet fragments, shell casings, and little plastic disks were recovered from the crime scene; some such items subsequently were found lodged in the victims themselves. The investigation disclosed that a .44-caliber revolver had been fired at Lourdes and Cesar in their respective bedrooms, and that a .45-caliber semiautomatic or autoloading firearm also had been fired in the home.

Twelve latent prints were obtained from the crime scene. One print taken from the bottom of a tin can in Lourdes's bedroom matched the right thumbprint from an exemplar of defendant's fingerprints.

House keys and the family minivan were discovered missing from the Cardenas home after the intruders left. The minivan subsequently was found

---

[3] Lourdes underwent three surgeries as a result of the shooting. At the time of trial, she still had a bullet in her left lung, which bled from day to day, and she had trouble breathing.

four blocks from the home of defendant's father in San Bernardino; there were no signs of forced entry or tampering to the vehicle.

The police arrested four persons. On May 22, 1989, Shawn Berry and Nathan were arrested in Los Angeles. On March 27, 1990, Michael Berry and defendant were arrested together in Rockville, Maryland.

### 2. The Defense Case

Defendant challenged Lourdes Cardenas's eyewitness identification of him as one of the perpetrators.

### B. The Penalty Phase

### 1. The Prosecution Case

The prosecution presented aggravating evidence of defendant's prior felony conviction for a robbery he committed on July 28, 1986, as well as the circumstances surrounding the robbery. Defendant had approached Frank Williams, who was sitting in his truck in a restaurant drive-through lane in the City of Compton, waved a gun in Williams's direction, and ordered him out of the truck. Defendant then got in and drove off. A week or two later, the truck was found stripped and dismantled.

The prosecution also introduced aggravating evidence of defendant's assault on a deputy sheriff during an inmate riot that occurred on June 5, 1991 at a Los Angeles county jail where defendant was confined while awaiting trial in this matter. Although defendant did not initiate the riot or the altercation that preceded it, he grabbed Deputy Scott Cramer and put a chokehold on him. Cramer's face turned "real red," and he had a hard time breathing: Another deputy sheriff struck defendant in the face, causing defendant to release Cramer. After more struggling, the deputies subdued defendant and placed him in handcuffs.

### 2. The Defense Case

The defense attempted to cast doubt on the prosecution's version of the June 5, 1991 incident, and portrayed defendant as having reacted defensively in his actions.

The defense also presented James Park, a prison consultant and retired Assistant Director of the California Department of Corrections. Park testified regarding level 4, the maximum level of security for prisoners serving sentences of life imprisonment without the possibility of parole. In Park's

view, defendant would adjust to prison as a life prisoner and could be managed properly and securely, given the strict controls of a level 4 prison. The type of incident that occurred in June 1991 at the county jail could not occur in a level 4 prison.

Additionally, defendant's parents and friends testified regarding his background and upbringing, as follows.

Defendant was born in Los Angeles on November 22, 1967, and had a number of siblings and half siblings. His father occasionally disciplined him and his siblings with a belt. Defendant was affectionate, respectful of older people, and able to get along with all of his brothers and sisters.

Defendant was somewhat slow in reading, spelling, and math, so he was placed in special education classes. He was good in woodworking and loved to draw. Defendant never got into serious trouble while growing up, but occasionally his mother had to go to school to speak with his teachers. He and his three brothers, however, had all been incarcerated by the time of the instant trial.

In June 1983, when defendant was a teenager, his mother was convicted of welfare fraud. She served nine months in state prison. During part of the time his mother was in prison, defendant lived in a camper with his father. At that point, Sylvia Longwood took defendant into her home because she knew he was a good kid and she loved him. Defendant lived "off and on" with the Longwood family for about a year. Sylvia Longwood made sure he went to school, and he did a lot of the work Longwood's sons refused to do. He also expressed more concern for her than had her own son over her recent surgery.

Defendant eventually dropped out of high school two years after his mother got out of prison.

Georgia Curtis met defendant in Carson in the summer of 1986. She had two sons, ages seven and 10 years, who spent time with defendant and got along well with him. Defendant was "sweet, kind, very considerate," had a good personality, and never mistreated Curtis. Curtis gave birth to defendant's son while defendant was in prison. Defendant had a close bond with his son, who was four years old at the time of trial. Curtis believed defendant should be allowed to live for his son's sake, as well as his own.

Finally, Dr. William Vicary, a psychiatrist, testified for the defense. Dr. Vicary had interviewed defendant, his parents, and two of his siblings. He also had reviewed various police and probation reports, defendant's prison records, the victim's autopsy report, reports of a clinical psychologist and

other individuals, and reports of interviews conducted on defendant's behalf. Based on his review, Dr. Vicary identified four "mitigating factors" in defendant's case: (1) defendant's family background was traumatic, with physically abusive parents who fought and yelled; (2) defendant exhibited borderline mental retardation with an IQ of 76; (3) with his passive, immature, and suggestible personality, defendant was dominated during the crimes by the more aggressive Michael Berry, whom he idolized; and (4) defendant felt remorse about the crimes, although at times he denied his involvement. Dr. Vicary testified that, while these background factors did not excuse or justify the crimes, they explained why defendant got himself involved in this "terrible situation."

## II. Discussion

### A. *Juror Selection Issues*

During the voir dire process, the prosecution exercised peremptory challenges against five prospective jurors who were African-American. Defendant himself is African-American, and only one African-American ultimately served as a juror in his case. Defendant contends the prosecutor's use of peremptory challenges to excuse the five prospective jurors violated his state constitutional right to trial by a jury drawn from a representative cross-section of the community (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*)) and deprived him of his federal constitutional rights to due process and equal protection of the laws under the Sixth and Fourteenth Amendments (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*)).

 There is a rebuttable presumption that peremptory challenges are exercised in a constitutional manner. (*Wheeler, supra,* 22 Cal.3d at p. 278.) But challenges used "to remove prospective jurors solely on the basis of membership in a cognizable racial group violate both the federal and state Constitutions." (*People v. Farnam* (2002) 28 Cal.4th 107, 134 [121 Cal.Rptr.2d 106, 47 P.3d 988].) A defendant who believes the prosecution is improperly using peremptory challenges for a discriminatory purpose is required to "raise a timely objection and make a prima facie showing that jurors are being excluded on the basis of racial or group identity." (*Id.* at p. 135; *Wheeler, supra,* 22 Cal.3d at p. 280.) To establish a prima facie case, the defendant must: (1) make as complete a record as feasible; (2) establish that the persons excluded are members of a cognizable group; and (3) show a strong likelihood or reasonable inference that such persons are being challenged because of their group association. (*Ibid.*) The failure to take these steps in the trial court forfeits the right to complain on appeal. (*People v.*

*Bolin* (1998) 18 Cal.4th 297, 316 [75 Cal.Rptr.2d 412, 956 P.2d 374]; see *People v. Anderson* (2001) 25 Cal.4th 543, 568 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

Here, defendant acknowledges he never raised a *Wheeler* or *Batson* objection at trial. Although the prosecutor, voluntarily and on his own initiative, gave reasons for challenging the five African-American prospective jurors, trial counsel, in every instance, either stood silent or affirmatively declined the trial court's invitation to comment on the prosecutor's statements. Counsel did not ask the trial court to make, nor did the court purport to make, any finding regarding the existence of a prima facie case of discrimination. Because defendant neither objected nor sought to establish a prima facie case of discrimination in the trial court, he has forfeited review of such issues on appeal. (*People v. Bolin, supra,* 18 Cal.4th at p. 316.)

Defendant contends we should overlook his failure to object. Relying on certain authorities, he asserts such objections would have been "superfluous" because the prosecutor had already put his reasons on the record and thereby commenced the *Wheeler/Batson* process. We are not convinced.

Defendant's authorities are inapposite, for they involved situations in which the defense actually made an objection or motion. (E.g., *People v. Sims* (1993) 5 Cal.4th 405, 427 [20 Cal.Rptr.2d 537, 853 P.2d 992]; *People v. Motton* (1985) 39 Cal.3d 596, 600–603 [217 Cal.Rptr. 416, 704 P.2d 176]; *People v. Hall* (1989) 208 Cal.App.3d 34, 40–41 [256 Cal.Rptr. 149].) That was not the case here. Not only did the defense fail in the first instance to object on *Wheeler* or *Batson* grounds, but it subsequently failed to offer any comment or opposing argument whatsoever after the prosecutor volunteered his reasons. Far from being superfluous, the voicing of objections and disagreement is critical for development of an adequate record on appeal for review of a *Wheeler/Batson* claim, and at the very least here was necessary to pinpoint trial counsel's position on the matter. For all we know, counsel stood silent because (1) they saw no legitimate basis for a *Wheeler/Batson* claim given their knowledge and observations of the excused jurors and/or (2) they themselves found one or more of the jurors objectionable from a defense standpoint. Under the circumstances presented, we decline to overlook the failure to object.

B. *Guilt Phase Issues*

 1. *Exclusion of Evidence of the Recovery and Release of $31,600 and Alleged Associated Narcotic Overtones to the Instant Offenses*

Defendant contends the trial court erroneously refused to permit the defense to present evidence at the guilt phase of drug-trafficking activity on

the part of the victims' family. Specifically, he argues, the court should have admitted evidence that Alex Cardenas, Lourdes's and Cesar's brother, removed an athletic bag containing $31,600 from the Cardenas house the day after the instant crimes, and evidence that the police recovered and then released the money to Lourdes Cardenas some two months later. According to defendant, evidence of the returned money and the related "narcotic overtones of the offense" was admissible: (1) to show the Cardenas family's apparent involvement in drug trafficking and the existence of other possible perpetrators who had a motive to commit the instant crimes; (2) to negate the prosecution theory that a stolen key provided entry to the Cardenas home and the theory that the shootings evidenced a premeditated plan to eliminate robbery witnesses; (3) to show that entry may have been with permission to discuss a possible drug transaction and that the shootings occurred during a drug trafficking negotiation gone bad, thereby negating the burglary-murder and robbery-murder special-circumstance allegations; and (4) to impeach Lourdes, who had a motive (a) to convert the instant crimes into a burglary/robbery to protect her family from criminal liability and (b) to strengthen the prosecution's case with her identification of defendant after she had been rewarded with return of the money. The exclusion of that evidence, defendant argues, constituted reversible error under California law and deprived him of his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution to confront and cross-examine the witnesses against him, to present a defense, and to reliable guilt and sentence determinations.

▪ Evidence possessing any tendency in reason to prove or disprove any disputed material fact is relevant. (Evid. Code, § 210; *People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Evidence is relevant if it "tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People v. Garceau, supra*, 6 Cal.4th at p. 177.) Evidence is irrelevant, however, if it leads only to speculative inferences. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1035 [99 Cal.Rptr.2d 1, 5 P.3d 68].) "As a condition precedent to challenging the exclusion of proffered testimony, Evidence Code section 354, subdivision (a), requires the proponent make known to the court the 'substance, purpose, and relevance of the excluded evidence . . . .' " (*People v. Ramos* (1997) 15 Cal.4th 1133, 1178 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

Here, defendant's offer of proof on the matter consisted of the following. Five days prior to opening argument, counsel informed the court: "We would ask the court to entertain at this time a motion in the nature of 402, I guess. And that would be regarding evidence that I would like to make an offer of proof, if I might. [¶] Evidence in this case is floating around the—as far as the phrases goes 'regarding some possible drug connection' of some of the victim's family, generally, but specifically, a brother of the deceased and

brother of Lourdes Cardenas, the surviving victim. We will ask the court's ruling as to the admissibility in these proceedings as to that kind of evidence."

When asked for a response, the prosecutor stated: "Only to say that I believe I understand counsel's offer of proof. And there is some indication that a brother by the name of Alex Cardenas, who again is the brother of Lourdes Cardenas, at the time of the offense was residing in Nevada and may be just an allegation at this point, may have been involved in drug dealing. [¶] With that alone, I would think and I would argue the point that it is irrelevant, number 1, because I think motive for this crime will be clear that this is a robbery situation turned into a killing and attempted killings after that. So it is irrelevant and also without any real direct foundation. So I will object on both counts and ask the court to rule it is inadmissible. Thank you." The trial court agreed with the prosecutor and stated it would bar any testimony along those lines, "unless [counsel] can convince me otherwise at a later time with more particularity."

The record plainly shows that defendant's offer of proof prior to the guilt phase did not advance any of the theories of relevance he presents now. Defendant failed to even mention the existence of any athletic bag containing money or the release of any money to Lourdes.[4] Consequently, review of the appellate contentions specifically pertaining to the athletic bag and released money evidence has been forfeited. (See *People v. Gordon* (1990) 50 Cal.3d 1223, 1264–1265 [270 Cal.Rptr. 451, 792 P.2d 251] [the defendant failed to raise federal constitutional basis for admission of orphanage records at capital penalty phase], disapproved on other grounds in *People v. Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

Moreover, as presented to the trial court, defendant's offer of proof was properly rejected. The offer, considered together with the prosecutor's comments on the matter, consisted at most of a vague claim of evidence "floating around" of a "possible drug connection" on the part of Alex Cardenas, who was living in Nevada. Trial counsel offered no explanation as to how Alex's alleged drug involvement had any tendency to prove or disprove any disputed material fact in the case, or what evidence was even available to establish Alex's drug connection and its relevance to the instant crimes. Given counsel's lack of specificity, the trial court properly precluded questioning on

---

[4] We note trial counsel subsequently spoke of the bag containing money and some of the relevance theories at the penalty phase. (See *post*, pt. II.C.1.) What transpired at the penalty phase, however, has no bearing on whether the trial court's evidentiary rulings at the guilt phase were correct.

the topic of Alex's alleged drug connection.[5] No state law or constitutional basis for a reversal appears.

### 2. Disclosure of the Recovery and Release of $31,600 to Lourdes

At the penalty phase of trial, the defense was permitted to call Detective Marks and Detective Simmons to testify at a hearing pursuant to Evidence Code section 402. (See *post*, pt. II.C.1.) Marks testified that on the day after the instant crimes, they received information from a confidential citizen informant that Alex Cardenas had left an estimated $75,000 in cash in a red suitcase at a residence on R Street in Wilmington. Marks went to that residence and found "$31,000 plus" in a burgundy-colored nylon athletic bag in the living room. Marks believed the burgundy bag to be the same one he had observed at the Cardenas home following the crimes. Simmons testified to the same effect. Additionally, when Simmons asked Lourdes Cardenas if she knew where the money came from, she said she did not know about the money. The police could not tie the money to "any narcotic activity" or to "Alex Cardenas in any type of narcotic activity." But because it was determined that the money was in the Cardenas home at the time of the subject crimes, Simmons released it to Lourdes.

Based on the above hearing testimony, defendant contends the prosecution violated its disclosure obligations under section 1054.1. In particular, he argues the prosecution was not in statutory compliance because it waited until the penalty phase to disclose *the reason* the police released the money found at the R Street residence to Lourdes, i.e., because the money was determined to have been in the Cardenas home. This information, he argues, was relevant to the issues of motive, lack of forced entry, and intent to kill, and to challenge Lourdes's credibility. Defendant further claims this statutory violation infringed on his federal constitutional rights under the Sixth and Fourteenth Amendments and *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] (*Brady*) to due process of law and a fair trial.

 Under section 1054.1, prosecutors are required to disclose any exculpatory evidence and any relevant written or recorded statements of witnesses or reports of the statements of witnesses whom they intend to call at trial. (§ 1054.1, subds. (e), (f).)

---

[5] On appeal, defendant attempts to establish the relevance of the evidence of possible narcotic overtones based on evidence, arguments, and court rulings made in coperpetrator Michael Berry's separate and subsequent trial. The events that occurred in Berry's later trial are not properly considered in this appeal. (See *People v. Waidla* (2000) 22 Cal.4th 690, 703, fn. 1 [94 Cal.Rptr.2d 396, 996 P.2d 46]; *People v. Sakarias* (2000) 22 Cal.4th 596, 635–636 [94 Cal.Rptr.2d 17, 995 P.2d 152]; *People v. Sanchez* (1995) 12 Cal.4th 1, 59 & fn. 5 [47 Cal.Rptr.2d 843, 906 P.2d 1129].)

■ Under the Fourteenth Amendment's due process clause, prosecutors must disclose evidence to a criminal defendant when it is " 'both favorable to the defendant and material on either guilt or punishment.' [Citations.] Evidence is 'favorable' if it hurts the prosecution or helps the defense. [Citation.] 'Evidence is "material" "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." ' " (*People v. Earp* (1999) 20 Cal.4th 826, 866 [85 Cal.Rptr.2d 857, 978 P.2d 15]; see also *Brady, supra*, 373 U.S. at p. 87.) Evidence probative of a testifying witness's credibility, including the potential for bias, is evidence favorable to the accused. (See *United States v. Bagley* (1985) 473 U.S. 667, 676 [87 L.Ed.2d 481, 105 S.Ct. 3375].)

As we explain below, defendant's contentions are based on information that was known or available to him at trial. Consequently, his failure to make proper objections, request appropriate sanctions, or seek any continuance on the matter is fatal to his contentions on appeal. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 411 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter*) [*Brady* claim found not cognizable on appeal]; cf. *People v. Marshall* (1996) 13 Cal.4th 799, 830–831 [55 Cal.Rptr.2d 347, 919 P.2d 1280] [claim that conviction was based on false testimony found waived]; *People v. Arias* (1996) 13 Cal.4th 92, 151 [51 Cal.Rptr.2d 770, 913 P.2d 980] [failure to seek sanctions or a continuance found fatal to claim that prosecutor had misled the defense concerning the content of a witness's testimony].)

In any event, the claims lack merit. Regardless whether the reason for the release of the $31,600 to Lourdes was material or even favorable to defendant, the record shows that references to all of the police activity relating to that money were contained in a "murder book" that had been made available to the defense as part of discovery. Defendant's counsel claimed to have reviewed the "entire" murder book "page by page" well before the trial began, and indeed, subsequently reported to the trial court, at the penalty phase, that "through all of the discovery that we've had in this case . . . there seems to have been a large amount of cash in the residence at the time of the crime and most probably, for sure, $31,600 in cash was recovered on the 12th of May, 1989, which was the very next day, of course, and was then later returned to Ms. Cardenas." (See *post*, pt. II.C.1.)

Although the murder book evidently did not set forth a reason why Detective Simmons released the money to Lourdes, that single omission did not constitute a failure to disclose or a suppression under either statutory or constitutional standards.

First, the critical facts pertaining to the money's existence, Alex Cardenas's reported drug involvement and actions, the recovery of $31,600 from the R

Street residence, and the money's later release to Lourdes, had been fully disclosed during discovery. Detective Simmons's testimony merely confirmed what defendant's counsel informed the court they already had gleaned from discovery, i.e., that the police concluded the recovered money had been in the Cardenas home at the time of the crimes. No violation of section 1054.1 appears.

■ Second, the prosecutor had no constitutional duty to conduct defendant's investigation for him. Because *Brady* and its progeny serve "to restrict the prosecution's ability to suppress evidence rather than to provide the accused a right to criminal discovery," the *Brady* rule does not displace the adversary system as the primary means by which truth is uncovered. (*United States v. Martinez-Mercado* (5th Cir. 1989) 888 F.2d 1484, 1488.) Consequently, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim." (*United States v. Brown* (5th Cir. 1980) 628 F.2d 471, 473; see also *United States v. Stuart* (8th Cir. 1998) 150 F.3d 935, 937 ["Evidence is not suppressed if the defendant has access to the evidence prior to trial by the exercise of reasonable diligence."]; *United States v. Slocum* (11th Cir. 1983) 708 F.2d 587, 599.) In any event, evidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery. (*United States v. Martinez-Mercado, supra,* 888 F.2d at p. 1488; see *United States v. Slocum, supra,* 708 F.2d at p. 600 [newly discovered evidence does not warrant a new trial unless, inter alia, the evidence is discovered *following* trial and the movant demonstrates due diligence to discover the evidence *prior to* trial].)

Once again, the record confirms the prosecutor's pretrial disclosure of the detectives' murder book entries regarding Alex Cardenas's reported transportation of a large sum of money from the Cardenas house to a residence on R Street the day after the crimes, the police recovery of $31,600 from the R Street residence, and the subsequent release of the $31,600 to Lourdes. Evidence of the reason for the release of the $31,600 to Lourdes was in fact presented at trial, albeit at the Evidence Code section 402 hearing, through the testimony of Detective Simmons. Trial counsel did not dispute the prosecutor's assertions in court that counsel had known Simmons's telephone number and that Simmons had been available for a year and a half to interview. Thus, the record demonstrates defendant had ample time and opportunity to investigate the matter in question and to discover the reason for the release of the money to Lourdes, but simply failed to do so. These circumstances do not amount to a suppression under *Brady, supra,* 373 U.S. 83.

In sum, the contentions complaining of the prosecution's belated disclosure and suppression provide no statutory or constitutional basis for a reversal.

### 3. *Lourdes's Testimony Regarding the Perpetrators' Demands*

During direct examination, Lourdes testified the perpetrators "were demanding money and telling us to just not do anything stupid and to give them what they wanted." On cross-examination, she further testified that Michael Berry asked for money. Although she could not remember exactly what he said, she testified he said something like, "Give us the money. Give us what we want." At one point, trial counsel asked, "Do you know—do you have any idea—do you know what they were referring to when they said, 'Give us what we want'? Do you know what he was talking about, what Michael Berry was talking about?" Lourdes answered, "No."

Defendant claims on appeal that Lourdes committed perjury when she responded that she had no idea what Michael Berry "was talking about" when he said, "Give us what we want." Noting the recovery and release of the $31,600 occurred more than two years before his trial, and asserting the $31,600 "was probably drug money from Alex Cardenas," defendant argues that both Lourdes and the prosecutor knew Lourdes's testimony was false because she must have known, at least by the time of trial if not on the night of the crimes, that the perpetrators were looking for the gym bag with its large sum of alleged drug money. Defendant further complains that the prosecutor's closing argument—that the perpetrators "went into a house and at gunpoint demanded property, demanded money, *and got that money*, got the jewelry as well as the dollars that Ms. Cardenas told us about" (italics added)—also falsely implied that the $2,000 that Lourdes gave the perpetrators (and not the gym bag containing thousands of dollars more) "was the purpose of the robbery which set this chain of events in motion." The prosecutor's knowing presentation of false testimony and/or false argument, defendant asserts, denied him his federal constitutional rights to due process of law, a fair trial, and a reliable conviction and sentence.

■ "Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted." (*People v. Seaton* (2001) 26 Cal.4th 598, 647 [110 Cal.Rptr.2d 441, 28 P.3d 175] [relying on *Napue v. Illinois* (1959) 360 U.S. 264 [3 L.Ed.2d 1217, 79 S.Ct. 1173] and other decisions].) Put another way, the prosecution has the duty to correct the testimony of its own witnesses that it knows, or should know, is false or misleading. (*In re Jackson* (1992) 3 Cal.4th 578, 595 [11 Cal.Rptr.2d 531, 835 P.2d 371], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6 [37

Cal.Rptr.2d 446, 887 P.2d 527].) This obligation applies to testimony whose false or misleading character would be evident in light of information known to the police involved in the criminal prosecution (*In re Jackson, supra,* 3 Cal.4th at p. 595), and applies even if the false or misleading testimony goes only to witness credibility (*id.* at p. 594; *Napue v. Illinois, supra,* 360 U.S. at p. 269; cf. *Giglio v. United States* (1972) 405 U.S. 150, 153–154 [31 L.Ed.2d 104, 92 S.Ct. 763].) Due process also bars a prosecutor's knowing presentation of false or misleading argument. (See *Miller v. Pate* (1967) 386 U.S. 1, 6–7 [17 L.Ed.2d 690, 87 S.Ct. 785]; *Brown v. Borg* (9th Cir. 1991) 951 F.2d 1011, 1015.) As we recently summarized, "a prosecutor's knowing use of false evidence or argument to obtain a criminal conviction or sentence deprives the defendant of due process." (*People v. Sakarias, supra,* 22 Cal.4th at p. 633.)

Here, the People argue review of these claims has been forfeited because the defense failed to raise the specific objection at trial or to request an appropriate admonishment, even though trial counsel knew from their pretrial review of the murder book all the information pertaining to the May 12, 1989 recovery of the $31,600 and its subsequent release to Lourdes (see *ante,* pt. II.B.2.). (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1016–1017 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Ervin* (2000) 22 Cal.4th 48, 92 [91 Cal.Rptr.2d 623, 990 P.2d 506].) Defendant counters, however, that the prosecution's constitutional duty to correct its witness's false testimony is not discharged merely because trial counsel knows the testimony is false. (See *United States v. LaPage* (9th Cir. 2000) 231 F.3d 488, 492.)

Even assuming defendant did not forfeit review, the claims are without merit. The fact that trial counsel's question called for present knowledge does not show that Lourdes's denial was false or misleading—she might not have known or believed at trial that the intruders supposedly were referring to a gym bag containing $31,600. With our review limited to the record on appeal, we still do not know that to be the case.

Defendant's conclusion that Lourdes must have known what Michael Berry specifically had in mind when he demanded, "Give us *what we want*" (italics added), does not inevitably or necessarily follow from the mere fact that the police released $31,600 to her after the crimes. Although it arguably may be inferred from Lourdes's receipt of the money that she might have at least suspected Michael Berry to have had some knowledge of the money, her testimony to the contrary was not physically impossible or demonstrably false. Notably, there was no evidence indicating that the intruders demanded any particular money amount, or that they pressed for significantly more cash after Lourdes relinquished $2,000 and her jewelry to them. Consequently, it

would not have been unreasonable, at the time of trial, for either her or the prosecutor to believe that the intruders knew nothing about a bag containing $31,600.

In sum, we cannot say the prosecutor misled the jury or violated defendant's due process rights when he failed to "correct" Lourdes's testimony or when he argued that the perpetrators got the money they demanded from her. Defendant's claims are rejected.

### 4. *Hearsay Evidence of Lourdes's Identification of Defendant*

Over defendant's hearsay objection, the trial court permitted Sergeant Twiford to give the following testimony concerning Lourdes's identification of defendant just after the crimes occurred. Twiford was the first police officer to arrive at the crime scene. He observed a male comforting Lourdes, who had what appeared to be gunshot wounds to the face and chest and "looked like she was going to lapse into unconsciousness or else going to die right on the spot." Twiford approached and asked Lourdes who did it. She responded by identifying three individuals: "Shawn Berry, Michael Berry and a male Negro by the name of Jesse."[6] The court permitted Twiford's testimony on the ground that Lourdes's statements were admissible under Evidence Code section 1240 as spontaneous statements.

On appeal, defendant renews his contention that Lourdes's statement of names to Twiford as to "who did it" constituted inadmissible hearsay. The erroneous admission of this hearsay, he argues, requires reversal of both his conviction and death sentence because, had that hearsay not been admitted, it is reasonably probable he would have garnered a more favorable result.

■ To qualify for admission under the spontaneous statement exception to the hearsay rule, "an utterance must first purport to describe or explain an act or condition perceived by the declarant. (Evid. Code, § 1240, subd. (a).) Secondly, the statement must be made spontaneously, while the declarant is under the stress of excitement caused by the perception. (*Id.*, subd. (b).)" (*People v. Farmer* (1989) 47 Cal.3d 888, 901 [254 Cal.Rptr. 508, 765 P.2d 940] (*Farmer*), disapproved on other grounds in *People v. Waidla, supra,* 22 Cal.4th at p. 724, fn. 6.) For purposes of the exception, a statement may qualify as spontaneous if it is undertaken without deliberation or reflection. (See *Farmer, supra,* at p. 903.) Although we have acknowledged that

---

[6] In response to the prosecutor's questioning, Twiford testified as follows: "Q: All right. Upon seeing what you see when you walked into that service porch area, what's the next thing you see or do? [¶] A: Well, I ask her who did it. She replied; she told me some names. [¶] Q: How many names did she give you? [¶] A: Three. [¶] Q: What were those names? [¶] A: Shawn Berry, Michael Berry and a male Negro by the name of Jesse."

responses to detailed questioning are likely to lack spontaneity, we also have recognized that an answer to a simple inquiry may be spontaneous. (*Id.* at p. 904, citing cases.) The trial court must consider each fact pattern on its own merits and is vested with reasonable discretion in the matter. (*Id.* at p. 904.)

Defendant argues that "[a]lthough the fact Lourdes had just been shot would support a finding that the statement was sufficiently 'spontaneous' and 'excited' to satisfy the requirements of [Evidence Code] section 1240, subdivision (b)[,] the problem here is that a statement identifying someone in response to a police officer's question is not a statement 'narrating,' 'describing,' or 'explaining' anything. Moreover, even if it were a statement describing a person by virtue of providing a name rather than a physical description, a person is not an 'act, condition, or event.' " We disagree.

■ Lourdes's spontaneous statement of names as to "who did it" described the event she perceived, that is, she saw "Shawn Berry, Michael Berry and a male Negro by the name of Jesse" participate in the crimes in her house on the date in question. Contrary to defendant's assertions, courts have found or recognized that statements purporting to name or otherwise identify the perpetrator of a crime may be admissible where the declarant was the victim of the crime and made the identifying remarks while under the stress of excitement caused by experiencing the crime. (See, e.g., *Farmer, supra,* 47 Cal.3d at pp. 904–905 [statements of shooting victim in response to questioning of police dispatcher and officer at the scene helped describe the crime by identifying the perpetrator]; *People v. Anthony O.* (1992) 5 Cal.App.4th 428, 433 [6 Cal.Rptr.2d 794] [seconds after shooting, victim stated to police officer, " 'I just been shot. You got the wrong car. It was Sharky from El Sereno.' "]; *In re Damon H.* (1985) 165 Cal.App.3d 471, 474, 476 [211 Cal.Rptr. 623] [in response to his mother's question why his buttocks hurt, crying minor stated, " '[b]ecause Damon put his weenie in my butt' "]; *People v. Jones* (1984) 155 Cal.App.3d 653, 659–662 [202 Cal.Rptr. 289] [when a treating physician asked a burn victim, 30–40 minutes after his injury, what had happened, victim responded that the person " 'I live with threw gasoline on me' "].) Defendant's efforts to distinguish the circumstances here—on the basis that Lourdes not only described defendant generally as a "male Negro" but also identified him specifically by his first name—are without merit. Moreover, where the spontaneous declarant is available as a witness, as Lourdes was here, "the existence and truth of the declaration may be explored in an examination under oath." (*People v. Arias, supra,* 13 Cal.4th at p. 150.)

Finally, defendant's position is not aided by *People v. Hines* (1997) 15 Cal.4th 997 [64 Cal.Rptr.2d 594, 938 P.2d 388] (*Hines*), which concluded that

the trial court there should have excluded the testimony of Jiy Williams that he asked Donna Roberts (the crime victim) over the telephone, " 'Who is there in the house with you?' " (*Hines, supra,* at p. 1035.) The trial court there, however, had found inadmissible Williams's testimony that Roberts had answered his question with the statement that the defendant was at the house. (See *id.* at p. 1034.) Given the trial court's decision barring admission of Roberts's answer, *Hines* observed that "[t]he mere fact that Williams asked the question was irrelevant, and telling the jury he had done so might have led it to speculate that Donna Roberts had answered by telling Williams that defendant was present." (*Id.* at p. 1035.) *Hines*'s conclusion regarding the irrelevant nature of Williams's inquiry to Roberts has no bearing on the legal issue here; indeed, neither side in that case had even argued the spontaneous statement exception to the hearsay rule to the trial court.[7]

In closing, we note defendant does not contend that the trial court's evidentiary ruling violated his federal constitutional right to confront a witness against him. (U.S. Const., 6th Amend.; *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] [holding that out-of-court statements by witnesses in response to police questioning are testimonial and therefore barred under the federal confrontation clause, unless such witnesses are unavailable and the defendants had a prior opportunity to cross-examine them].) Nor could he successfully do so, in any event. (*Crawford v. Washington, supra,* 541 U.S. at p. 59 [124 S.Ct. at p. 1369, fn. 9] ["when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements"].)

### C. *Penalty Phase Issues*

#### 1. *Exclusion of Evidence of the Recovery and Release of $31,600 and Alleged Associated Narcotic Overtones to the Instant Offenses*

At the penalty phase, defendant twice sought to introduce evidence of alleged drug-trafficking activity on the part of the victims' family, i.e., Alex Cardenas's supposed removal of over $30,000 from the Cardenas house, the

---

[7] *Hines* noted that, due to the prosecutor's failure to argue the point at trial, the Attorney General was barred on appeal from asserting that the victim's telephonic statement was admissible pursuant to the spontaneous statement exception to the hearsay rule. (*Hines, supra,* 15 Cal.4th at p. 1034, fn. 4.) Although *Hines* proceeded to reject the merits of the Attorney General's argument, it did so on the basis that, on the facts before it, the trial court could reasonably have concluded that the victim's identification of defendant in response to a question was not spontaneous. (*Id.* at pp. 1034–1035, fn. 4.) That conclusion in *Hines* does not compel a different result here, for as defendant concedes, the fact Lourdes had just been shot supports the trial court's determination that the statement was sufficiently spontaneous and excited for admission under Evidence Code section 1240.

police recovery of $31,600, and the later release of that money to Lourdes Cardenas. Pursuant to Evidence Code section 402, defendant made one offer of proof just prior to the penalty phase and a second offer during the case in mitigation. He was unsuccessful both times. In this claim, defendant argues the trial court's rulings constituted error under state law and denied his federal constitutional rights to confrontation, to put forward a defense and present relevant evidence in mitigation at the penalty phase, and to a reliable capital sentence.

Before the start of the penalty phase, trial counsel informed the court of their desire to call Lourdes to the stand and question her regarding the presence of a large amount of money in the Cardenas house on the night of the crimes. As part of their offer of proof, counsel indicated testimony from Detective Simmons would show that the day after the instant crimes, police officers, acting on an anonymous call, went to the house of Bertha Gamboa on R Street in Wilmington and recovered a large sum of money that apparently belonged to Alex. Thereafter, the police released the money to Lourdes.

In moving the court to allow introduction of this evidence at the penalty phase, counsel argued that any drug involvement by Lourdes and her family "would be important and relevant as far as the circumstances of the crime itself." (See § 190.3, factor (a).) Counsel specifically contended: "If, in fact, [the Cardenas] family was known by the people and it has come out that Shawn Berry knew the family, that Michael Berry knew the family, and they are known to have large sums of money and, in fact, they had large sums of money at that time, I think that the jury should know that factor. It's a part of this robbery. The robbery that happened and if the robbery itself—the robbery and the murder are factors in aggravation, then the jury should know everything about that robbery and murder. There are reasons to believe that that money was in the house or supposed to have been in the house at the time the robbery went down."

The trial court denied defendant's motion. Because there was nothing to indicate that defendant or his cohorts committed their crimes with an awareness that some $31,000 or so was in the Cardenas home, the court agreed with the prosecutor that no nexus had been shown between the money and the circumstances of the crimes. The court, however, indicated defendant could renew his motion at any time with additional information.

Subsequently, during the defense case, defendant renewed his motion to introduce evidence concerning the recovery and release of the $31,600. This time, counsel read to the court certain entries that Detective Marks and Detective Simmons made in the murder book. The entries chronicled their

reports pertaining to their knowledge and recovery of the money, and included references to confidential informant information regarding Alex's alleged drug trafficking and alleged connection to the money.[8] Another entry reflected that on August 9, 1989, Detective Simmons released $31,600 to Lourdes.

In making this last offer of proof, counsel asked permission to introduce evidence, *apart from any alleged drug connection*, that $31,600 was in the house at the time of the crimes, that Alex Cardenas removed the money to another house, and that later the police released the money to Lourdes. Counsel argued such evidence related to the circumstances of the crime and should be admitted in fairness to the defense.[9] Counsel feared that, if such information were omitted, either the jury might think or the prosecutor could argue the robbery was a random picking of a house in a neighborhood, while the defense would be prohibited from pointing to the large amount of money in the victims' house as refuting such a notion or argument.

Outside the presence of the jury, the court allowed defendant to call Detective Marks and Detective Simmons to the stand. Detective Marks testified, among other things, that on May 12, 1989 (the day after the instant crimes), he received a telephone call from a confidential citizen informant (who he believed was a family member or a close Cardenas family friend) who said that Alex had left an estimated $75,000 in cash in a red suitcase at a specific R Street address in Wilmington. Marks and his partner went to the R Street residence and found "$31,000 plus" in a burgundy-colored nylon athletic bag in the living room. Marks believed the burgundy bag to be the same one he had observed at the Cardenas home following the crimes. Marks

---

[8] Counsel read the following entry dated May 12, 1989, at 8:15: " 'Contacted by confidential citizen informant who I.D.'d self as a friend of the Cardenas family. The confidential informant reported that word circulating as a result of the shooting identified the youngest son, Alex Cardenas, as the number one in narcotics trafficking in Wilmington. He lives in Las Vegas but had been at the Marine Avenue residence this past Monday, 5/8/89. He flies frequently between California and Nevada and presumed the suspects went there looking for him.' " Counsel also read the following entry dated May 12, 1989, at 12:50: " 'Received information . . . from confidential citizen informant who reported that Alex Cardenas had taken a red suitcase containing an estimated $75,000 in U.S. currency to a residence at 1117 West R Street Wilmington, accompanied by Detective' looks like R-O-M-A-N-T, 'went to location and pursuant to consent search recovered $31,600. See property receipt section 5.' "

[9] Defendant argues that counsel additionally pointed out and remarked during the hearing, "there was a statement made . . . to Lourdes, 'Where is the rest of it?' . . . that Lourdes made when she was testifying. And this was the rest of it. It just didn't get found." Although defendant correctly notes counsel's argument, he fails to provide citations to the record where Lourdes Cardenas purportedly made the statements attributed to her. We have reviewed the reporter's transcripts and are unable to find any testimony by Lourdes herself to the effect that one of the perpetrators asked her, "Where is the rest of it?"

then made a report regarding the phone call and his subsequent actions in recovering the money. He indicated he followed up on the original telephone call because there were "narcotic overtones" surrounding the Cardenas residential robbery and because he heard from another telephone caller that the "word on the street" was that Alex Cardenas, identified by the caller as a younger brother who was the number one drug dealer in narcotics in Wilmington, actually lived in Las Vegas but commuted between the Las Vegas and San Pedro areas. Also, Marks believed that someone at the R Street residence told him, in Spanish through an interpreter, that Alex Cardenas had brought the bag and left it at the R Street address.

Detective Simmons testified that the day after the Cardenas crimes, he became aware of the same information as Marks. Simmons was aware that Marks had recovered over $31,000 in cash from a residence in Wilmington. When Simmons asked Lourdes if she knew where the money came from, she said she did not know about the money. Simmons returned the money to Lourdes, although she knew nothing about it, because (1) information known to the police established that the money was in the Cardenas house at the time of the robbery; and (2) Lourdes and her mother had not returned to work and were out of funds. Significantly, Simmons testified that the money could not be tied to "any narcotic activity" or to "Alex Cardenas in any type of narcotic activity."

After the two detectives testified, counsel argued, "the court now has evidence that clearly shows that this 31,000 plus in cash was in the Cardenas house when these people came in and this crime was committed." Counsel then reiterated the point that "the fact that this money was there is something that the jury should and needs to know in able to take into consideration and evaluate all the circumstances of the crime." In particular, counsel stressed the importance of the information "from the defense side, at least so that the jury—so that the jury has all of the information . . . so that they know that this house was not necessarily picked out of the blue and randomly, for no reason at all, and made the target of a residential robbery, that there was indeed a large amount of cash money there and for the reasons that the court has heard today."

After hearing the prosecutor's hearsay and relevance objections, the trial court denied the motion once again. Specifically, the court found that "the vast majority of the testimony is, in fact, hearsay" and "over and above that, this entire line of questioning will be irrelevant even under 190.3."

■ As previously indicated (*ante*, pt. II.B.1.), evidence possessing any tendency in reason to prove or disprove any disputed material fact is relevant and may be admissible at trial. (Evid. Code, §§ 210, 351; *People v. Garceau, supra*, 6 Cal.4th at pp. 176–177.) Even if relevant, however, hearsay evidence—i.e., "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"—is inadmissible "[e]xcept as provided by law." (Evid. Code, § 1200.)

■ Although a trial court enjoys broad discretion in determining the relevance of evidence (*People v. Garceau, supra*, 6 Cal.4th at p. 177), it lacks discretion to admit evidence that is irrelevant (*People v. Heard* (2003) 31 Cal.4th 946, 973 [4 Cal.Rptr.3d 131, 75 P.3d 53]; *People v. Crittenden* (1994) 9 Cal.4th 83, 132 [36 Cal.Rptr.2d 474, 885 P.2d 887]) or excluded under constitutional or statutory law (e.g., Evid. Code, § 1200, subd. (b)). The proponent of proffered testimony has the burden of establishing its relevance, and if the testimony is comprised of hearsay, the foundational requirements for its admissibility under an exception to the hearsay rule. (See *People v. Ramos, supra*, 15 Cal.4th at pp. 1177–1178; *People v. Rodriquez* (1969) 274 Cal.App.2d 770, 777 [79 Cal.Rptr. 240]; see generally Evid. Code, §§ 110, 403, 405, 550.) Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence. (E.g., *People v. Hill* (1967) 66 Cal.2d 536, 569–570 [58 Cal.Rptr. 340, 426 P.2d 908]; *People v. Thomas* (1969) 269 Cal.App.2d 327, 329 [74 Cal.Rptr. 617].)

Here, defendant's offers of proof regarding Alex's supposed actions and drug involvement, and the alleged narcotic overtones of the instant crimes, consisted largely of inadmissible third party hearsay. In response to the prosecutor's hearsay objections, defendant made no attempt to cite or establish a hearsay exception. Nor did he argue a nonhearsay purpose for the admission of such evidence or any drug-related testimony. Accordingly, defendant failed to preserve his claim of penalty phase error as it relates to such evidence. (*People v. Ramos, supra*, 15 Cal.4th at p. 1178.)

■ Exclusion of the inadmissible hearsay at issue did not violate defendant's constitutional rights. As we recently explained, the United States Supreme Court has never suggested that states are without power to formulate and apply reasonable foundational requirements for the admission of evidence. (*People v. Ramos, supra*, 15 Cal.4th at p. 1178 [discussing *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038], *Skipper v. South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669], and other U.S. Supreme Court decisions]; see also *People v. Phillips* (2000) 22 Cal.4th 226, 238 [92 Cal.Rptr.2d 58, 991 P.2d 145].) Foundational

prerequisites are fundamental, of course, to any exception to the hearsay rule. (*People v. Ramos, supra,* 15 Cal.4th at p. 1178.) Application of these ordinary rules of evidence to the alleged drug-related components of the proffered testimony did not impermissibly infringe on defendant's right to present a defense. (See *ibid.,* and cases cited therein.)

Nonetheless, it has been recognized that due process requires the admission of hearsay evidence at the penalty phase of a capital trial, even though a state's evidentiary rules are to the contrary, " 'if both of the following conditions are present: (1) the excluded testimony is "highly relevant to a critical issue in the punishment phase of trial," and (2) there are substantial reasons to assume the reliability of the evidence.' " (*People v. Champion* (1995) 9 Cal.4th 879, 938 [39 Cal.Rptr.2d 547, 891 P.2d 93]; see *People v. Phillips, supra,* 22 Cal.4th at p. 238.) Setting aside the question whether the proffered hearsay was "highly relevant" to any critical penalty phase issue, there appear no reasons, substantial or otherwise, supporting its reliability. Indeed, as Detective Simmons testified, the police had investigated the matter but were unable to tie the money to "any narcotic activity" or to "Alex Cardenas in any type of narcotic activity." On this record, exclusion of the hearsay evidence did not deprive defendant of due process.

Although the prosecutor conceded that at least some of the proffered evidence was not inadmissible hearsay—i.e., the evidence that Detective Marks went to the Gamboa residence on R Street and recovered $31,600 in cash from that residence and the evidence that Detective Simmons later released the money to Lourdes—he nonetheless argued it was irrelevant and therefore properly excluded. The trial court agreed with the prosecutor, and we now review the trial court's exclusion of that nonhearsay evidence.

Even assuming that the mere presence of the $31,600 in the Cardenas house at the time of Cesar's murder was a circumstance that the jury properly could consider pursuant to section 190.3, factor (a), we see no basis for reversing the penalty determination. For purposes of determining the appropriateness of the death penalty, such evidence hardly served to extenuate the circumstances surrounding the murder. The evidence showed that defendant and his cohorts invaded the Cardenas home at midnight, that defendant executed Cesar with two gunshots to the head, that he and a cohort then fired guns at Lourdes as she held her four-month-old baby, and that another cohort shot at Lourdes's mother with a semiautomatic weapon. That a large sum of money was in the Cardenas home at the time did not render defendant's actions any less aggravated, heinous, or reprehensible than they otherwise would be. Nor did such circumstance tend to lessen defendant's guilt or the gravity of the burglary, robbery, murder, and attempted murders for which he was convicted. (Cf. *People v. Lucero* (2000) 23 Cal.4th 692, 723–724 [97

Cal.Rptr.2d 871, 3 P.3d 248] [approving trial court's instructional definition of "extenuating circumstances"].)

Moreover, defendant's argument at trial on this point was that the evidence was relevant to rebut any potential juror belief or prosecutorial argument that the perpetrators randomly chose the Cardenas residence for their crimes.[10] The prosecutor, however, never actually advanced such an argument. In any case, the jury was well aware from evidence presented at the guilt phase that the Berry brothers knew the Cardenas family and evidently chose to rob them with that knowledge. Accordingly, we are confident that any conceivable error in excluding evidence that $31,600 was in the Cardenas home at the time of the crimes was harmless under any standard. (*People v. Lucero* (1988) 44 Cal.3d 1006, 1032 [245 Cal.Rptr. 185, 750 P.2d 1342] [applying the reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] to errors resulting in the exclusion of potentially mitigating evidence]; see also *People v. Brown* (2003) 31 Cal.4th 518, 576 [3 Cal.Rptr.3d 145, 73 P.3d 1137] [applying reasonable possibility standard].)

### 2. *Effect of Lourdes's Guilt Phase Testimony*

During his closing argument, the prosecutor described the Cardenas family as: "A family living in a home, working family, Cesar Cardenas trying to run his printing business, Lourdes Cardenas working at St. Mary's Hospital. She has a little baby girl. Her mom living with them in the house. A family living in a residential neighborhood not bothering anybody." He later commented: "To take a young man trying to live his life and work a job, help out the family, live with the family and turn him into this in his own home is inexcusable and warrants only one punishment."

Defendant contends the foregoing comments exploited the prejudicial effect of what he claims was Lourdes's false testimony at the guilt phase that she had no idea what the perpetrators were referring to when they demanded, "Give us what we want." (See *ante*, pt. II.B.3.) Specifically, defendant argues that the prosecutor relied on Lourdes's uncorrected testimony to present a false and misleading picture of the circumstances of the crimes in support of a death sentence. He also claims that the reliability of his death judgment was

---

[10] Defendant argues on appeal that the evidence also was relevant for purposes of challenging the credibility of Lourdes Cardenas, the prosecution's star witness at the guilt phase. Once Lourdes's credibility is undermined, defendant argues, "her identification of [him as a perpetrator] becomes suspect, as does her entire story concerning the events of the night in question." Defendant's failure to raise this point at trial, however, forfeits review of the matter here. (*People v. Ramos, supra*, 15 Cal.4th at p. 1178.) In any event, Lourdes did not testify at the penalty phase, and such evidence was not admissible to religitate the issue of guilt during the penalty phase. (See *People v. Miller* (1990) 50 Cal.3d 954, 1005 [269 Cal.Rptr. 492, 790 P.2d 1289].)

"grievously undermined" because the prosecutor was permitted to unfairly bolster the credibility of Lourdes, the prosecution's star witness.

The People contend, as a procedural matter, that defendant's failure to object to the prosecutor's penalty phase comments forfeits review of his contentions on appeal. (See *People v. Farnam*, *supra*, 28 Cal.4th at p. 196; *People v. Barnett* (1998) 17 Cal.4th 1044, 1177 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Defendant counters that review is appropriate because any objection would have been futile in light of the court's evidentiary rulings regarding the recovery and return of the $31,600. (See *People v. Arias*, *supra*, 13 Cal.4th at p. 159.)

Even assuming these penalty phase contentions have not been forfeited, they are lacking in merit. As already explained (*ante*, pt. II.B.3.), the record does not establish that Lourdes's testimony was demonstrably false or misleading. Accordingly, the contentions lack foundation insofar as they are premised on the assumption that Lourdes gave false testimony at the guilt phase.

The record, moreover, contains no evidence of the victims' involvement in drug dealing or any other crime. Although defendant had made an offer of proof that the out-of-state brother, Alex, may have been involved in drug trafficking and may have transported a gym bag containing $31,600 from the Cardenas home to a different residence just after the crimes, the trial court properly ruled that such evidence was inadmissible third party hearsay. (*Ante*, pt. II.C.1.) Consequently, the prosecutor's comments—describing the victims as a working family who did not bother anybody—were perfectly appropriate in light of the evidence both before the jury and in the record.[11]

### 3. *Motion to Modify the Death Verdict*

In ruling on the automatic motion to modify the death verdict (§ 190.4, subd. (e)), the trial court discussed its findings on each of the statutory factors in aggravation and mitigation. Specifically, it found the presence of certain aggravating circumstances pursuant to section 190.3, factors[12] (a) (circumstances of the underlying crime), (b) (other violent criminal activity), and (c) (prior felony convictions), and found some evidence of mitigating circumstances pursuant to factor (k) (any other circumstance extenuating the gravity of the crime).

With respect to factor (e), the court stated the following: "Subdivision (e), whether or not the victim was a participant in the defendant's homicidal

---

[11] Because we find that no misconduct occurred, there is no need to reach defendant's further claim that the perceived misconduct prejudiced the outcome of his trial.

[12] All further references to factors are to the factors set forth in section 190.3.

conduct or consented to the homicidal act, court finds this to be aggravating circumstances. Cesar Cardenas did nothing to promote, consent, or instigate his death. Nothing more than absolute and total, complete cooperation." With regard to factor (j), the court found: "Subdivision (j), whether or not the defendant was an accomplice to the offense and participation in the commission of the offense was relatively minor. And the offense herein the defendant was the perpetrator of the killing of Cesar Cardenas and the attempted murder of Lourdes Cardenas, court finds this to [be] an aggravating factor."

Based on this record, defendant argues the trial court erroneously viewed factors (e) and (j) as aggravating even though those factors may only be considered mitigating. By relying on impermissible factors to deny the automatic motion to modify the verdict, defendant contends, the court violated state law and his state and federal constitutional rights to due process and a reliable, individualized capital sentencing verdict.[13]

■ Like the jury in its penalty phase determinations, a trial court ruling on a motion to modify may rely on the presence of the aggravating circumstances identified in factors (a), (b), and (c). Factors (d) (extreme mental or emotional disturbance), (e), (f) (defendant's belief in moral justification or extenuation), (g) (extreme duress or substantial domination), (h) (diminished mental capacity), and (j), however, can only mitigate, and the absence of any of these factors may not be considered aggravating. (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1184, 1186 [259 Cal.Rptr. 701, 774 P.2d 730]; see also *People v. Riel, supra*, 22 Cal.4th at p. 1223 [absence of a mitigating factor is not itself aggravating]; *People v. Davenport* (1985) 41 Cal.3d 247, 288–290 [221 Cal.Rptr. 794, 710 P.2d 861].)

■ In *Carpenter, supra*, 15 Cal.4th 312, we considered a similar situation in which the trial court purported to find that factor (d), pertaining to a defendant's extreme emotional or mental disturbance, " 'supports aggravation' because the 'evidence shows that the defendant carefully planned each of these homicides' and 'was not under the influence of any extreme mental or emotional disturbance.' " (*Carpenter, supra*, at pp. 423–424.) Although we acknowledged that the mere absence of a mitigating factor is not itself aggravating, we observed the trial court could properly consider in aggravation the objective circumstances of the underlying killing. (*Id.* at p. 424; see also *People v. Cooper* (1991) 53 Cal.3d 771, 848 [281 Cal.Rptr. 90, 809 P.2d 865].) As relevant here, we held that "[a]ny error in considering these

---

[13] Because the modification hearing in this case was held before our decision in *People v. Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984] became final, we reach the merits of this claim despite defendant's failure to object at trial. (*People v. Riel* (2000) 22 Cal.4th 1153, 1220 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

circumstances under the wrong statutory factor did not affect the court's decision." (*Carpenter, supra,* 15 Cal.4th at p. 424.)

 We see no factual or legal basis for distinguishing the instant situation from that in *Carpenter, supra,* 15 Cal.4th 312. Although the perceived errors in this case involve factors (e) and (j), all the evidence the trial court cited pertained to the objective circumstances of the underlying crime, which the court properly could consider under factor (a). Additionally, the trial court was explicit in its opinion that "the aggravating circumstances so far outweigh the mitigating circumstances" as to render the matter "not even close." That conclusion is soundly supported by the evidence.

In sum, we find no reasonable possibility that the perceived state law errors affected the ruling and no basis for remanding this case for a new modification hearing. (*Carpenter, supra,* 15 Cal.4th at p. 425; see *People v. Wader* (1993) 5 Cal.4th 610, 667 [20 Cal.Rptr.2d 788, 854 P.2d 80] [even where trial court erroneously considered probation report, no remand was necessary when court's statement of decision made apparent that issue of penalty was not close].) In light of these conclusions, defendant's related state and federal constitutional claims are rejected.

#### 4. *Constitutionality of California's Death Penalty Statute*

Defendant contends many features of this state's capital sentencing scheme (§ 190 et seq.) violate the United States Constitution. We have repeatedly rejected such contentions, as follows.

 Contrary to defendant's arguments, section 190.2 is not impermissibly broad. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 510 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Lewis* (2001) 26 Cal.4th 334, 393 [110 Cal.Rptr.2d 272, 28 P.3d 34].) Factor (a) is not unconstitutionally vague (*People v. Jones* (2003) 30 Cal.4th 1084, 1128 [135 Cal.Rptr.2d 370, 70 P.3d 359]; *People v. Hillhouse, supra,* 27 Cal.4th at p. 510), and there is no merit to the claim that factor (a) has been used in ways so arbitrary and contradictory as to violate the federal guarantee of due process of law (*People v. Lewis, supra,* 26 Cal.4th at p. 394; see *Tuilaepa v. California* (1994) 512 U.S. 967, 976–980 [129 L.Ed.2d 750, 114 S.Ct. 2630]). Allowing consideration of unadjudicated criminal activity under factor (b) is not unconstitutional and does not render a death sentence unreliable. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1138 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Barnett, supra,* 17 Cal.4th at p. 1178.) Use in the sentencing factors of such adjectives as "extreme" (factors (d), (g)) and "substantial" (factor (g)) does not act as a

barrier to the consideration of mitigating evidence in violation of the federal Constitution. (*People v. Lewis, supra,* 26 Cal.4th at p. 395; *People v. Anderson, supra,* 25 Cal.4th at p. 601.)

■ The trial court was not constitutionally required to inform the jury that certain sentencing factors were relevant only in mitigation, and the statutory instruction to the jury to consider "whether or not" certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors. (*People v. Kraft, supra,* 23 Cal.4th at pp. 1078–1079; see *People v. Memro* (1995) 11 Cal.4th 786, 886–887 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Indeed, "no reasonable juror could be misled by the language of section 190.3 concerning the relative aggravating or mitigating nature of the various factors." (*People v. Arias, supra,* 13 Cal.4th at p. 188.)[14]

■ The death penalty statute does not fail to perform the constitutionally required narrowing function by virtue of the number of special circumstances it provides or the manner in which they have been construed. (*People v. Frye* (1998) 18 Cal.4th 894, 1029 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Ray* (1996) 13 Cal.4th 313, 356 [52 Cal.Rptr.2d 296, 914 P.2d 846].) We have previously declined to find that a statistical analysis examining published appeals from murder convictions for the years 1988–1992 warrants reconsideration of our conclusions. (*People v. Frye, supra,* 18 Cal.4th at pp. 1028–1029.)

■ The jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty. (*People v. Hillhouse, supra,* 27 Cal.4th at p. 510; *People v. Lewis, supra,* 26 Cal.4th at p. 394.) The death penalty statute is not

---

[14] As part of this contention, defendant asserts, in essence, that the prosecutor committed misconduct that exacerbated the confusing nature of the statutory instruction during his closing argument to the jury. Defendant's failure to object and request an admonishment at trial forfeits review of this matter on appeal. (*People v. Montiel* (1993) 5 Cal.4th 877, 936–937 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People v. Proctor* (1992) 4 Cal.4th 499, 544 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) In any event, we have reviewed the record and conclude that, as for the portion of the prosecutor's remarks relating to the general law concerning aggravating and mitigating factors, no reasonable juror would understand them in the manner defendant construes them, especially in light of the trial court's proper instructions. As for the portion of the prosecutor's argument relating to specific evidence in the case, all such evidence pertained to the circumstances of the underlying crime, which the jury properly could consider under factor (a).

unconstitutional for failing to provide the jury with instructions of the burden of proof and standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination. (*People v. Welch* (1999) 20 Cal.4th 701, 767 [85 Cal.Rptr.2d 203, 976 P.2d 754]; see *People v. Anderson*, *supra*, 25 Cal.4th at p. 589.) We repeatedly have held that neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] affects California's death penalty law or otherwise justifies reconsideration of the foregoing decisions. (*People v. Cleveland* (2004) 32 Cal.4th 704, 765 [11 Cal.Rptr.3d 236, 86 P.3d 302]; *People v. Martinez* (2003) 31 Cal.4th 673, 700–701 [3 Cal.Rptr.3d 648, 74 P.3d 748]; *People v. Prieto* (2003) 30 Cal.4th 226, 262–263 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) And contrary to defendant's assertion, *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] does not undermine our analysis on the point. That recent decision simply relied on *Apprendi* and *Ring* to conclude that a state noncapital criminal defendant's Sixth Amendment right to trial by jury was violated where the facts supporting his sentence, which was above the standard range for the crime he committed, were neither admitted by the defendant nor found by a jury to be true beyond a reasonable doubt.

 Finally, intercase proportionality review is not constitutionally required. (*People v. Cox* (2003) 30 Cal.4th 916, 970 [135 Cal.Rptr.2d 272, 70 P.3d 277]; *People v. Farnam*, *supra*, 28 Cal.4th at p. 193; *People v. Anderson*, *supra*, 25 Cal.4th at p. 602.) Nor does equal protection require that capital defendants be provided with the same sentence review afforded other felons under the determinate sentencing law. (*People v. Cox*, *supra*, 30 Cal.4th at p. 970, and cases cited.)

### 5. *Cumulative Error*

Defendant contends that the cumulative effect of the errors at each phase of trial denied him his constitutional rights to a fair trial and a reliable penalty determination, thus requiring reversal of both the guilt and penalty judgments. We disagree. Whether considered individually or together, the two or possibly three errors that occurred in this case were minor and harmless.

### III. DISPOSITION

For the reasons stated above, we find no reversible error in the record. The judgment of death is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied February 23, 2005.