Filed 4/13/23

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>NOE SAUCEDO,<br><br>     Defendant and Appellant. | A160851<br><br>(Contra Costa County<br>Super. Ct. No. 51820984) |

Appellant Noe Saucedo (appellant) appeals following his conviction of various offenses, including two counts of murder and one count of evading a police officer causing injury, after a stolen truck he was driving collided with another truck and killed two young girls. He argues insufficiency of the evidence and presents various claims of evidentiary and instructional error. In the published part of this decision we conclude the trial court erred in admitting testimony regarding numerous minor driving offenses committed by appellant to prove he acted with implied malice, but the error was non-prejudicial. We reverse the conviction for evading but otherwise affirm.

PROCEDURAL BACKGROUND

In November 2018, the Contra Costa County District Attorney filed an information charging appellant with two counts of murder (Pen. Code, § 187,

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.–VIII. of the Discussion.

subd. (a); counts one and two);[1] evading a police officer causing injury (Veh. Code, § 2800.3, subd. (a); count three); driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a); count four); and possessing a controlled substance (Health & Saf. Code, § 11377; count five).

In October 2019, a jury found appellant guilty as charged.

In July 2020, the trial court sentenced appellant to prison for 15 years to life, consecutive to a term of seven years eight months for the evading offense (seven years) and the taking charge (eight months).

The present appeal followed.

FACTUAL BACKGROUND

On the morning of January 17, 2018, a white Ford F250 pickup truck was stolen from a street in Pittsburg. At some point after noon, sheriff's deputy Quinton Valentine saw the truck leave a gas station parking lot. Deputy Valentine was in a patrol car, and he followed the truck into a fast food parking lot. Valentine noticed the driver of the truck, who he identified as appellant, look back at him in the truck's mirrors.

Deputy Valentine followed the white truck onto Highway 4 East. He noticed the truck's brake lights were working. The deputy followed appellant two to three car lengths behind. He did not initiate a traffic stop or pursuit (in which he would use lights and sirens) because he needed to wait for backup. The deputy continued to follow appellant, who drove at the speed of traffic, about 65 to 70 miles per hour. No other car was between the patrol car and the truck, and the deputy followed appellant's lane changes.

As appellant approached the exit for Somersville Road, he moved into the exit-only lane, and then he changed lanes again to stay on the freeway. Deputy Valentine followed appellant's lane changes. An eyewitness said it

_____

[1] All undesignated statutory references are to the Penal Code.

2

appeared the patrol car was purposely changing lanes when the truck did in order to follow the truck.

The truck then almost passed the exit ramp and "nearly to the last minute … swerved in an abrupt manner" onto a "little dirt embankment" and then "back onto the exit ramp for Somersville."  When Deputy Valentine saw that, he followed down the ramp, radioed dispatch that he was in pursuit, and activated the patrol car's overhead lights and sirens.  The officer was about 15 car lengths behind appellant at that point.

The white truck accelerated as it went down the exit ramp, from about 55 to about 70 to 80 miles per hour.  An eyewitness testified it appeared the truck was trying to get away.  Another eyewitness testified, "It was definitely faster than what a vehicle would be going down a ramp usually, absolutely."  The truck's brake lights did not activate as it sped down the ramp.

There was a traffic light showing red in appellant's direction at the end of the exit ramp.  The truck sped through the red light and crashed into a silver Ford F150 truck that was driving on Somersville Road.  The silver truck was smaller than the white truck.  The crash was "[v]ery, very loud;" it "[s]ounded like a bomb going off."  The impact of the collision pushed the silver truck over a large raised median and into the oncoming traffic lanes.  The white truck stopped in the median.  Debris scattered everywhere; it looked like there had been "an explosion."

Deputy Valentine radioed to broadcast that a collision had occurred at the intersection of Somersville Road and Highway 4.  That broadcast was about two to five seconds after he initiated pursuit.

The driver of the silver truck, Edith R., was unconscious after the crash.  She arrived at the hospital with a deformity of the left arm bone, a forehead laceration, and tenderness to her left knee.  Tests revealed a broken

3

arm, rib fractures, and a trace of a hemorrhage in her abdomen. She was admitted to intensive care and discharged two days later.

Edith R.'s two young daughters, Jane Doe 1 and Jane Doe 2, were in car seats in the backseat of the silver truck. Jane Doe 1 was four years old and Jane Doe 2 was two years old. Jane Doe 1 was on the passenger side of the truck, which suffered the most impact. That side was pushed in over a foot, which indicated a "large amount of impact force." One of the first responders testified, "Most modern vehicles, [] if they have intrusion, it's from extreme speed of impact. . . . [A]nd this definitely had it. Pickup trucks like F150's don't usually show that, they are pretty heavy robust vehicles. . ." Jane Doe 1 was taken to one hospital and then transferred to a second; she was pronounced dead at the second hospital. An autopsy revealed bruising and abrasions on various parts of her body. Her jaws and nose were fractured, she had other facial injuries, and the right side of her head had a "large" depressed skull fracture; it takes a lot of force to create such a fracture. Her brain was swollen and had surface and internal hemorrhages. Jane Doe 1 died from blunt force head injury due to the car accident.

Jane Doe 2 arrived at the hospital in a coma with a very severe brain injury. She was pronounced dead due to "full brain death" on January 19, 2018. An autopsy revealed that, among other things, Jane Doe 2 had swelling of the brain and three large bruises on her scalp from the blunt force of the accident. Her brain injuries would have taken "quite a bit of force" to produce. The cause of death was blunt force head injury.

Appellant was ejected out of the driver's side window of the white truck. He did not have any apparent injuries. He initially was unconscious, but then it appeared to a police officer on the scene that he was pretending to be unconscious. As he was put in the ambulance, appellant was alert and

4

complained of pain, but uncooperative. At the hospital, appellant did not follow commands during an examination, but it appeared he was doing so volitionally, rather than due to an injury. He had a hematoma and bruise on his scalp but "minimal other signs of traumatic injury." He was discharged later the same day.

Deputy Valentine found two bags containing methamphetamine in appellant's pants pocket. A test of appellant's blood was positive for methamphetamine and amphetamine (a metabolite of methamphetamine). An expert in drug impairment opined that a person with appellant's level of methamphetamine in their system would be under the influence. At that level, the drug would be "having a visible [e]ffect on them," but the person could still function. The quantity in appellant's system was "about in the middle of the parameters for recreational use." Methamphetamine can speed up a person's thought process and make it difficult for them to concentrate. Generally, a person under the influence of methamphetamine is hyper-animated in their speech and physical activity.

The collision was described as a "broadside" or "T-bone" collision. It was a "heavy front-end collision," and the entire front portion of the white truck was damaged. The right front wheel had detached, and the battery had detached and was thrown from the truck. The damage showed the collision occurred with "very great force." Inside the vehicle, the steering column appeared to have been tampered with, the ignition was drilled through or removed, and the stereo was missing. Prior to the collision, the truck's braking system worked. Investigators collected from the truck an empty beer can, a broken glass pipe, and a set of keys with several shaved or bent keys. Shaved keys can be used for stealing vehicles.

The right side of the silver truck suffered damage from front to back. A structural support in the middle of the truck was bent back "at a pretty sharp angle."

Appellant's Prior Driving and Methamphetamine Offenses

The jury also heard evidence about nine prior driving and methamphetamine offenses committed by appellant between 2013 and the day before the 2018 collision.

First, in June 2013, appellant was pulled over for speeding. He was driving 74 miles per hour in an area with a speed limit of 55 miles per hour. Appellant did not have a driver's license. He received citations for speeding and driving without a license.

Second, in August 2013, appellant was pulled over for making an "unsafe start" after an officer observed him accelerating rapidly and causing a truck's tires to spin and "burn out." Appellant told the officer the gas pedal "got stuck." Appellant was in possession of a bindle of methamphetamine and a pipe of a kind commonly used for smoking methamphetamine. Appellant was arrested for possession of methamphetamine and the pipe.

Third, in August 2014, appellant was arrested at a house for possession of methamphetamine.[2] Appellant told the officer that when he used methamphetamine the high would last two to three days and he usually stayed awake for days. Appellant also had a pipe and a shaved car ignition key. Appellant said he found the key at a park, and he admitted knowing it was for stealing cars.

---

[2] The year was also identified as 2015. It is immaterial whether the incident happened in 2014 or 2015.

Fourth, later in August 2014, appellant was a passenger in a vehicle that was stopped by the police. Appellant was arrested for possession of methamphetamine.

Fifth, in December 2014, a police officer pulled appellant over for making a right turn against a red light without coming to a full stop. Appellant was in possession of marijuana and a methamphetamine pipe, and had a suspended license. Appellant was cited for driving with a suspended license and possessing marijuana, and the car was towed.

Sixth, in April 2016, appellant was pulled over because the vehicle he was driving was missing a license plate. Appellant was in possession of methamphetamine, a pipe, and shaved keys. Appellant was arrested for possessing methamphetamine, drug paraphernalia, and burglary tools.

Seventh, in September 2017, appellant failed to stop completely at a stop sign. The car's registration was expired and it had a fake registration sticker. Appellant admitted he had pulled the sticker off a car in a junkyard. Appellant was in possession of methamphetamine and a pipe, and was arrested.

Eighth, in October 2017, appellant was pulled over for "roll[ing] through" a stop sign. The officer discovered appellant's license was suspended, and appellant received citations for failing to stop at a stop sign, driving on a suspended license, and failing to have proof of insurance. Appellant's car was towed.

Ninth, on January 16, 2018, the day before the collision, appellant was pulled over for "driving on the sidewalk, and kind of passing . . . stopped traffic [at a] light." The car's registration was expired and appellant's license was suspended. Appellant was cited for the suspended license and the car was towed.

DISCUSSION

I.    *There Was Sufficient Evidence of Implied Malice*

Appellant contends his convictions for the second degree murders of Jane Doe 1 and Jane Doe 2 were not supported by substantial evidence that he acted with conscious disregard for human life.  We reject the contention.

In considering a challenge to the sufficiency of the evidence, we "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

"[S]econd degree murder based on implied malice has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' ". . . .' "  (*People v. Watson* (1981) 30 Cal.3d 290, 300; see also § 188, subd. (a)(2) ["Malice is implied . . . when the circumstances attending the killing show an abandoned and malignant heart."].)  "The concept of implied malice has both a physical and a mental component.  [Citation.]  The physical component is satisfied by the performance of ' "an act, the natural consequences of which are dangerous to life." ' [Citation.]  The mental component . . . involves an act ' "deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' "  (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 106–107 (*Nieto Benitez*).)  "In short, implied malice requires a defendant's awareness of engaging in conduct that

8

endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143.)

"It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence." (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697 (*Costa*).) Further, "our courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach." (*Id.* at p. 698.)

Appellant mistakenly argues "the evidence presented below . . . primarily consisted of prior traffic violations." The evidence allowed the jury to infer that appellant knowingly possessed a stolen truck and attempted to evade capture by suddenly veering off the freeway, accelerating down the exit ramp, and careening through a red light without attempting to brake. (See, e.g., *People v. Moore* (2010) 187 Cal.App.4th 937, 941 (*Moore*) [in discussing evidence of implied malice, noting the defendant "ran a red light and struck a car in the intersection without even attempting to apply his brakes"]; *People v. Lima* (2004) 118 Cal.App.4th 259, 267 (*Lima*) [in discussing evidence of implied malice, emphasizing the defendant fled from the police at high speeds].) The evidence further showed that appellant was under the influence of methamphetamine, knew that he would stay high for days, and must have known methamphetamine affected his decisionmaking and ability to concentrate. (See *People v. Murphy* (2022) 80 Cal.App.5th 713, 727 (*Murphy*) ["numerous appellate courts have upheld murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol and other controlled substances"]; see also *People v. Bennett* (1991) 54 Cal.3d 1032, 1038 (*Bennett*) [" 'There is a very commonly

9

understood risk which attends every motor vehicle driver who is intoxicated.' "]; accord, *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091 (*Johnigan*).) The jury could reasonably infer that by getting behind the wheel while high on methamphetamine and then attempting such a risky escape appellant was acting "with conscious disregard for life." (*Nieto Benitez*, *supra*, 4 Cal.4th at pp. 106–107.)

Appellant points out he did not drive dangerously before he abruptly veered off the freeway, but appellant's safe driving before he decided to flee is not inconsistent with a finding he consciously drove dangerously when he did try to escape. Appellant points out there is little evidence from which the jury could infer that he saw the lights on Deputy Valentine's patrol car once pursuit commenced. While we conclude there is insufficient evidence on that point to support the conviction for evading a police officer causing injury (see Part VIII, *post*), there *was* sufficient evidence from which the jury could reasonably infer that appellant was aware a patrol car was following him. In particular, Deputy Valentine testified appellant looked back towards the deputy in both his left and rearview mirrors when the deputy was behind appellant in a parking lot. The evidence showed the patrol car closely tracked the movements of the white truck, including mirroring lane changes. For the most part, the patrol car was only two or three car lengths behind, and there were no cars between the white truck and the patrol car. And, of course, appellant's abrupt and reckless freeway exit itself is strong evidence he was aware he was being followed. It was not necessary that appellant saw the patrol car's lights in order for the jury to infer appellant drove

10

dangerously in order to avoid being stopped by the authorities in a stolen vehicle.[3]

Appellant also points out that this case does not involve the relatively longer course of dangerous driving involved in a number of previous vehicular homicide cases. (See, e.g., *Moore, supra,* 187 Cal.App.4th at pp. 939–940; *Lima, supra,* 118 Cal.App.4th at pp. 263–264; *People v. Contreras* (1994) 26 Cal.App.4th 944, 956–957; *People v. Fuller* (1978) 86 Cal.App.3d 618, 628–629.)[4] However, the tragic circumstance that appellant almost immediately collided with another motorist does not preclude a finding that appellant's driving immediately prior to the collision demonstrated implied malice. Appellant's brief dangerous driving was every bit as dangerous as the driving involved in the prior cases; the facts in the present case need not closely track those in the prior cases. (See *Costa, supra,* 183 Cal.App.4th at p. 698.)

Appellant also argues for the first time in his reply brief that the circumstance that he was under the influence of methamphetamine is not significant because it does not mean he was "impaired" or could not "function." That argument has been forfeited. (*Proctor, supra,* 213 Cal.App.4th at pp. 1273–1274.) In any event, just because the evidence did not show that appellant had a high level of impairment does not mean

---

[3] Appellant argues for the first time in his reply brief that there was no evidence appellant stole the truck or knew it was stolen. That argument has been forfeited. (*Proctor v. Vishay Intertechnology, Inc.* (2013) 213 Cal.App.4th 1258, 1273–1274 (*Proctor*).) In any event, appellant does not challenge the sufficiency of the evidence for his conviction of driving or taking a vehicle without consent (Veh. Code, § 10851), and the jury could reasonably infer from the record that appellant knew the truck was stolen.

[4] In his reply brief, appellant also attempts to distinguish *Moore* on the basis that the defendant in that case made callous remarks when he was arrested. (*Moore, supra,* 187 Cal.App.4th at p. 940.) However, the court did not rely on those remarks in its implied malice analysis. (*Id.* at pp. 941–942.)

11

that his intoxication had no effect on his driving or decision making. Driving is one of the most complex and potentially dangerous tasks that individuals undertake on a regular basis. Appellant's decision to drive while high strongly supports the jury's finding of implied malice. (*Bennett, supra*, 54 Cal.3d at p. 1038; *Murphy, supra*, 80 Cal.App.5th at p. 727; *Johnigan, supra*, 196 Cal.App.4th at p. 1091.)

Finally, and at greatest length, appellant argues the evidence of his prior driving offenses did not provide a basis for the jury to infer he had subjective awareness of and conscious disregard for the risk to life posed by his driving. We agree with appellant that the prior incidents involved in the present case are not analogous to those involved in prior cases that have relied on a defendant's driving history to support a finding of implied malice.[5] As appellant points out, a jury may infer from prior instances of reckless driving that "the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and understanding of the personal and social consequences of such behavior." (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 115 (*Ortiz*).) As we address below (Part II, *post*), there is no evidence that in any of his prior driving incidents appellant was prosecuted or obligated to attend a class regarding the dangers of reckless or intoxicated driving, and none of the prior incidents actually involved any danger to life. Nevertheless, as is evident from the analysis in the preceding paragraphs, the evidence was sufficient to support a finding of implied malice *without any consideration of appellant's driving history*. (See *Johnigan, supra,* 196 Cal.App.4th at p. 1091 ["there is no requirement of a 'predicate act,' i.e., a prior DUI or an alcohol-related accident necessary to establish

---

[5] In Part II, *post*, we conclude the trial court erred in admitting evidence of the incidents, but the error was harmless.

implied malice"].)  The circumstance that appellant's prior driving history was not probative does not establish that insufficient evidence supports the finding of implied malice.

II.     *The Trial Court Erred in Admitting Evidence of Certain Prior Traffic Offenses, But the Error Was Not Prejudicial*

Appellant contends the trial court abused its discretion by admitting evidence of appellant's prior traffic offenses as proof of implied malice.  We agree; the general rule excluding evidence of uncharged misconduct has significant clarifications and exceptions limiting its application, but none is broad enough to justify the trial court's ruling.  The evidence should have been excluded, but it is not reasonably probable the error affected the outcome of the trial.

Evidence Code section 1101, subdivision (a) generally prohibits the admission of evidence of specific instances of a person's conduct "to prove his or her conduct on a specified occasion."  Section 1101, subdivision (b), however, clarifies this rule by allowing "admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as . . . intent, . . . knowledge, . . . absence of mistake or accident . . .) other than his or her predisposition to commit such an act."  "Although a prior criminal act may be relevant for a noncharacter purpose to prove some fact other than the defendant's criminal disposition, the probative value of that evidence may nevertheless be counterbalanced by [an Evidence Code] section 352 concern.  Evidence may be excluded under [Evidence Code] section 352 if its probative value is ' " 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " ' "  (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238 (*Hendrix*).)

13

A.     *Background*

In the present case, prior to trial, the prosecution moved to admit evidence of appellant's prior driving offenses "as evidence of knowledge to prove the subjective intent of the defendant."  The prosecution argued the incidents were relevant "to the subjective knowledge of implied malice as it tends to show that the defendant's arrests, prosecutions, convictions, probations, and license suspensions would clearly demonstrate the dangerousness of drunk [sic] driving given the consequences the defendant faced on the prior occasions."[6]  The trial court ultimately admitted evidence of the nine incidents summarized in the factual background portion of this decision, some pursuant to the motion in limine and some at trial.

The trial court instructed the jury regarding the purposes for admission of the evidence using CALCRIM No. 375.  The court told the jurors that, if they decided appellant committed the acts described in the incidents, the jurors "may, but are not required to, consider that evidence for the limited purpose of deciding whether . . . The defendant's prior acts of speeding, spinning tires, failing to stop at a stop sign, driving on a sidewalk and stopping in an intersection, running a red light and driving without a license are evidence of implied malice when he acted in this case.  [And whether t]he driving on the sidewalk evidence is evidence of the defendant's knowledge of the danger of such driving."

Additionally, the court instructed the jurors they could consider evidence that appellant previously possessed shaved keys for the "limited purpose of deciding whether" appellant "acted with the intent to deprive the

---

[6] As is evident from this decision's summary of the facts, there is no evidence in the record of any "prosecutions, convictions, probations" or other "consequences" suffered by appellant due to the prior driving offenses.

14

owner of the vehicle of possession or ownership of the vehicle" and as "evidence of knowledge of the use of shaved keys." The jurors could consider "evidence of the prior use and/or possession of methamphetamine as evidence of the defendant's intent to evade the peace officer" and as "evidence of knowledge of the character and effect of illegal drugs."

The trial court further instructed that, "In evaluating this evidence, consider the similarity or lack of similarity between the uncharged acts and the charged offenses. [¶]Do not consider this evidence for any other purpose. [¶]Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶]If you conclude that the defendant committed the uncharged acts, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged crimes. The People must still prove each charge beyond a reasonable doubt."[7]

B.    *Analysis*

In *Ortiz, supra,* 109 Cal.App.4th at p. 110, the court of appeal considered in detail the prosecution's use of " 'uncharged misconduct' " or " 'uncharged bad acts' " to prove implied malice. (*Id.* at p. 110.) In that case,

_____

[7] Appellant contends the instruction lessened the prosecutor's burden of proof. That objection has been forfeited because the instruction is not an incorrect statement of the law and appellant did not object below or request modifications to the instruction. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012; see also *People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 436 [stating that similar instruction, CALJIC No. 2.50, is "in general, a correct statement of the law"].) In any event, the instruction did not lessen the burden of proof because it only told the jurors they "may, but are not required to, consider" the incidents as relevant to the issue of implied malice. (See *id.* at p. 437.) The instruction also told the jurors any such prior incidents were "only one factor to consider" and emphasized that "[t]he People must still prove each charge beyond a reasonable doubt."

the "challenged evidence consisted of documentary and oral testimony concerning seven past incidents in which defendant had either been convicted of reckless driving, convicted of reckless drunk driving, or been observed driving recklessly, and his participation in a mandatory educational program . . . on the dangers of drinking and driving." (*Ibid.*) The prosecution there argued, as the prosecution did in the present case, "that the evidence was relevant because it tended to establish a subjective awareness on the part of defendant of the disastrous consequences that can follow in the wake of recklessly operating a motor vehicle on a public highway." (*Id.* at p. 111.)

The *Ortiz* court reviewed cases decided since the Supreme Court upheld a drunk driver's conviction of second degree murder in *People v. Watson*, *supra*, 30 Cal.3d 290. The *Ortiz* decision held the challenged evidence was properly admitted, even though there was no evidence of intoxication in the incident underlying the appeal. (*Ortiz*, *supra*, 109 Cal.App.4th at p. 112.) The court of appeal summarized the rationale for admitting the uncharged conduct as follows: "courts have recognized repeatedly that a motor vehicle driver's previous encounters with the consequences of recklessness on the highway—whether provoked by the use of alcohol, of another intoxicant, by rage, or some other motivator—sensitizes him to the dangerousness of such life-threatening conduct. This is so because apprehensions for drunk driving, and the citations, arrests, stiff fines, compulsory attendance at educational programs, and other consequences do not take place in a vacuum." (*Id.* at pp. 112–113; see also *id.* at pp. 113–115 [summarizing cases].) The court continued, "A jury is entitled to infer that regardless of the mental state or condition that accompanies an instance of reckless driving—whether intoxication, rage, or wilful irresponsibility—the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and

16

understanding of the personal and social consequences of such behavior." (*Id.* at p. 115.)

Appellant argues, and we agree, that the inference described by the *Ortiz* court is not one a jury could permissibly make from the prior incidents at issue in the present case. None of the prior incidents involved driving as dangerous as the driving that killed Jane Doe 1 and Jane Doe 2. There is no evidence that appellant injured anyone in any of the prior incidents, or that he came close to injuring anyone. (Cf. *People v. Eagles* (1982) 133 Cal.App.3d 330, 340 ["Evidence of excessive speed resulting in a near collision is relevant to knowledge of risk . . . of excessive speed."].) There is no evidence that appellant suffered any serious consequences, such as prosecution and incarceration, for any of the prior traffic violations. And there is no evidence appellant was ever required to attend any educational programs about the dangers of reckless driving or driving under the influence. In sum, none of the incidents admitted at trial were "encounters with the consequences of recklessness on the highway" from which jurors could reasonably infer appellant was "sensitize[d] . . . to the dangerousness of such life-threatening conduct." (*Ortiz, supra,* 109 Cal.App.4th at pp. 112–113.) Accordingly, the trial court erred in admitting, as described in the instruction, evidence of appellant's "prior acts of speeding, spinning tires, failing to stop at a stop sign, driving on a sidewalk and stopping in an intersection, running a red light and driving without a license."

Nevertheless, appellant was not prejudiced by admission of the evidence of his prior driving offenses. As explained previously (Part I, *ante*), the evidence supports the finding of implied malice without consideration of any of his prior driving conduct. Furthermore, because the prior acts did not involve any clearly dangerous driving, they did not have an inherent

17

tendency to prejudice the jury against appellant. Even assuming jurors disregarded the trial court's instruction *not* to consider the incidents as evidence of appellant's propensity for bad driving, the incidents only involved relatively minor traffic infractions. Although the incidents reflected appellant's disregard for abiding by the requirement that he only drive with a valid driver's license, he also cooperated with the police in all the incidents described at trial. Indeed, defense counsel highlighted that evidence in suggesting that, because appellant had cooperated with the police previously, it was unlikely he was trying to flee when he went down the exit ramp prior to the collision in the present case. It is not "reasonably probable" the outcome would have been more favorable for appellant had the prior driving offenses evidence been excluded. (*People v. Benavides* (2005) 35 Cal.4th 69, 91.)[8]

III.    *Appellant Has Not Shown Error in the Instruction on Accident*

Appellant contends the court erred by giving an instruction on accident over his objection. He argues the instruction was inconsistent with his defense that the prosecution had not proved implied malice. We reject the claim.

The trial court instructed the jury, in the language of CALCRIM No. 510 ("Excusable Homicide: Accident"), that, "The defendant is not guilty of murder if he killed someone as a result of accident or misfortune. Such a killing is excused, and therefore not unlawful, if: [¶] 1. The defendant was

---

[8] We observe that appellant does not contend the court erred in admitting evidence of appellant's possession of methamphetamine, related paraphernalia, and shaved keys. Only three of the seven prior driving incidents did *not* involve such possession (in two of the nine prior incidents appellant was not driving a car). Accordingly, even if the trial court had excluded evidence of appellant's driving conduct, testimony about some aspects of the incidents at issue would have been admissible at trial.

18

doing a lawful act in a lawful way; [¶] 2. The defendant was acting with usual and ordinary caution; [¶]AND [¶] 3. The defendant was acting without any unlawful intent. [¶] A person acts with usual and ordinary caution if he acts in a way that a reasonably careful person would act in the same or similar situation. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was not excused.  If the People have not met this burden, you must find the defendant not guilty of murder."  The court gave the instruction over appellant's objection, explaining that the murder instruction (CALCRIM No. 520) requires the prosecution to prove appellant killed without "lawful excuse," and CALCRIM No. 510 defines the excuse of accident.

On appeal, appellant argues the trial court failed to respect the defense's "prerogative" not to have the jury instructed on the affirmative defense of accident.  He relies on the decision in *People v. Jo* (2017) 15 Cal.App.5th 1128 (*Jo*), which concluded that "a trial court should not instruct the jury on an inconsistent affirmative defense over the defendant's objection." (*Id.* at p. 1168.)  There, the defendant was convicted of child custody deprivation (§ 278.5), and he argued the trial court erred by instructing on a statutory defense based on a person acting due to a risk of harm to the child (§ 278.7).  (*Jo*, at p. 1134.)  The court of appeal held an instruction on the statutory defense was inconsistent with the defense theory of the case, because the "defendant's sole 'defense' was that the prosecution failed to prove its case," while the statutory defense "required the jury to presume that the prima facie elements of the crime were true." (*Id.* at p. 1168.)  "[T]he trial court placed defendant in the potentially contradictory position of having to argue, on the one hand, that the prosecution failed to prove she committed the crime of child custody deprivation and, on the other

19

hand, that if she committed the acts constituting the crime she was justified in so doing." (*Ibid.*)

The present case is distinguishable. It is true defense counsel did not argue in closing that the collision was an "accident" within the meaning of CALCRIM No. 510, which would require that appellant was "doing a lawful act in a lawful way." Defense counsel did suggest a reasonable inference from the evidence was that appellant lost control of the truck, but the actual defense theory of the case was that the prosecution had failed to prove implied malice—counsel argued, "There's no conscious disregard. There's no evidence here." Although appellant did not rely on the accident defense, that defense was not inconsistent with the defense theory because the accident defense did not require presumption of any of the elements of the murder charge other than that the defendant killed the victims, which was undisputed. Accordingly, appellant has not shown error under *Jo*, *supra*, 15 Cal.App.5th 1128.[9]

Appellant also argues the jury would have understood the accident instruction to relieve the prosecution of its burden of proving implied malice. We disagree. There is no "reasonable likelihood" (*People v. Ayala* (2000) 24 Cal.4th 243, 289) the jury believed it could convict appellant of murder simply because the prosecution negated the defense of accident. The trial court instructed the jury on the elements of murder, including malice and implied malice. (*People v. Solomon* (2010) 49 Cal.4th 792, 822 [" '[T]he correctness of jury instructions is to be determined from the entire charge of

---

[9] Appellant also relies on dicta in *People v. Velez* (1983) 144 Cal.App.3d 558, at page 568, to argue he had the "prerogative" to waive the accident instruction for tactical reasons. Because that was a passing comment made in dicta, *Velez* fails to provide any meaningful guidance on when a court errs by giving an instruction on a defense over a defendant's objection.

the court, not from a consideration of parts of an instruction or from a particular instruction.' "].)  The trial court also instructed the jury in the language of CALCRIM No. 200 that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case.  Do not assume just because I give a particular instruction that I am suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

Appellant points to no portion of any of the closing arguments where either counsel discussed CALCRIM No. 510, much less suggested it relieved the prosecution of the burden of showing implied malice.  Rather, the sufficiency of the evidence of implied malice was the main focus of the arguments.  (*People v. Young* (2005) 34 Cal.4th 1149, 1202 ["The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury."].)  Appellant has not shown error.  (See *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [" ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' "].)

IV.    *No Error in Refusal of Voluntary Manslaughter and Vehicular Manslaughter Instructions*

Appellant contends the trial court erred in refusing to instruct on voluntary manslaughter and vehicular manslaughter.  The claims fail.

"An appellate court applies the . . . de novo standard of review to the failure by a trial court to instruct on an uncharged offense that was assertedly lesser than, and included, in a charged offense."  (*People v. Waidla*

(2000) 22 Cal.4th 690, 733.) A trial court is obligated to instruct on lesser included offenses that are supported by substantial evidence. (*Ibid.*)

As to voluntary manslaughter, the trial court did not err because no evidence supported the instruction. "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108 (*Lasko*).) Neither circumstance existed in the present case.[10] As to vehicular manslaughter, appellant does not dispute that case authority holds that the offense is not a lesser included offense to murder. (See *People v. Sanchez* (2001) 24 Cal.4th 983, 989, disapproved on other grounds in *People v. Reed* (2006) 38 Cal.4th 1224, 1228–1229; see also *People v. Bettasso* (2020) 49 Cal.App.5th 1050, 1058; *People v. Wolfe* (2018) 20 Cal.App.5th 673, 685–686.)

Nevertheless, appellant argues he was deprived of a fair trial because it was "fundamentally unfair" to deny instructions on voluntary and vehicular manslaughter and thereby present the jury with an "all or nothing" choice between murder and an acquittal. Appellant relies on *Beck v. Alabama* (1980) 447 U.S. 625, a capital case in which the jury was presented with the

---

[10] In his reply brief, appellant suggests a trial court is obligated to give an instruction on voluntary manslaughter whenever there is evidence raising a doubt the defendant acted with implied malice. However, appellant fails to explain how that would be consistent with the California Supreme Court's statement in *Lasko* and other cases that voluntary manslaughter applies only in " 'limited, explicitly defined circumstances.' " (*Lasko, supra*, 23 Cal.4th at p. 108; see also § 192, subd. (a).) To the extent appellant argues for extending the scope of the voluntary manslaughter offense based on the common law, that argument has been forfeited because it was presented for the first time in his reply brief. (*Proctor, supra*, 213 Cal.App.4th at pp. 1273–1274.)

choice of either imposing the death penalty or acquitting the defendant because of a state statute that prohibited an instruction on a lesser included offense supported by the evidence. (*Id.* at pp. 627–629.) However, the California Supreme Court observed that "[t]he *Beck* rule has never since been extended beyond the capital context. Moreover, in two more recent cases, the high court has given *Beck* itself a narrow construction." (*People v. Breverman* (1998) 19 Cal.4th 142, 167; see also *People v. Rundle* (2008) 43 Cal.4th 76, 142 (*Rundle*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Appellant cites no authority to the contrary. In any event, *Beck* is distinguishable because in the present case there was no lesser included offense supported by substantial evidence.

Appellant also contends his due process rights were violated because the prosecutor below did not agree to instructions on the lesser related offense of vehicular manslaughter. However, appellant acknowledges his claim is foreclosed by the California Supreme Court's decision in *People v. Birks* (1998) 19 Cal.4th 108. (See also *People v. Jennings* (2010) 50 Cal.4th 616, 668.) He argues *Birks* should be reconsidered, but we are bound to follow the decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[11]

Appellant fails to show any error in the omission of instructions on voluntary or vehicular manslaughter.

---

[11] We reject any suggestion we may decline to follow *Birks's* clear rule because a policy consideration referenced in *Birks* is purportedly not present in this case. We also reject the suggestion that omission of the vehicular manslaughter instruction deprived appellant of the right to present his defense theory of the case to the jury. As explained by the Supreme Court in *Rundle*, that argument is foreclosed by *Birks*. (*Rundle*, *supra*, 43 Cal.4th at p. 148.)

V.    *No Error in Exclusion of Evidence That Appellant Asked About Victims*

Appellant contends the trial court abused its discretion by excluding questions appellant asked about the condition of the victims after the collision.  We reject the claim.

A.    *Background*

Before trial, appellant moved to admit evidence that he inquired about the victims' well-being shortly after the collision.  Specifically, appellant referenced evidence that he "continuously asked . . . if the kids in the grey truck were ok" about five minutes after the accident and evidence that he asked a hospital nurse " 'Are the people I hit ok?' " and " 'Are the other people in the accident ok?' "  Appellant argued that the statements were admissible as non-hearsay circumstantial evidence he did not have an "abandoned and malignant heart" before the collision (§ 188, subd. (a)(2)), or, alternatively, that they were hearsay admissible under the state of mind exception.  The People opposed the motion, arguing the statements were untrustworthy and were irrelevant because they did not bear on his state of mind before the crash.  The trial court concluded the statements were not "sufficiently trustworthy to be admitted under [Evidence Code] section 1250 . . ."

B.    *Analysis*

"Except as otherwise provided by statute, no evidence is admissible except relevant evidence."  (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.)  "Evidence is relevant if it 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]'  [Citation.]  Evidence is irrelevant, however, if it leads only to speculative inferences."  (*People v. Morrison* (2004) 34 Cal.4th 698, 711 (*Morrison*).)  Relevant evidence may be excluded "if its probative value is substantially outweighed by the probability that its admission will (a)

necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) It is inadmissible unless an exception applies. (Evid. Code, § 1200, subd. (b).) We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Rodriguez* (2017) 16 Cal.App.5th 355, 373.)

Appellant argues the trial court erred in excluding the evidence as inadmissible hearsay. He argues it was not being offered to prove the truth of the matter stated because "The evidence consisted of questions regarding the children's well-being. Like a request or command, questions are not statements of positive fact. Such evidence cannot be meaningfully evaluated in terms of its truth or falsity and cannot serve as proof of a factual matter." (See, e.g., *People v. Jurado* (2006) 38 Cal.4th 72, 117 ["Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated."].) In response, respondent argues the questions were untrustworthy "implied" hearsay—that is, untrustworthy implied assertions that appellant was concerned for the victims. (See, e.g., *People v. Garcia* (2008) 168 Cal.App.4th 261, 289; *People v. Morgan* (2005) 125 Cal.App.4th 935, 943.)

We need not decide whether appellant's questions could be considered implied hearsay in the circumstances of the present case, because they were properly excluded as irrelevant. Although callous conduct by a defendant following infliction of an injury may support an inference that a defendant acted with implied malice (*People v. Ogg* (1958) 159 Cal.App.2d 38, 51), that does not mean that appellant's alleged expressions of concern were relevant.

25

Appellant's post-collision expressions of concern were fully consistent with three possible realities: (1) appellant did *not* act with an abandoned and malignant heart; (2) appellant *did* act with an abandoned and malignant heart but felt immediate remorse after he realized the collision injured or killed two little girls; or (3) appellant *did* act with an abandoned and malignant heart but wanted to make it *appear* he was concerned for the victims. There was no reasonable basis for the jury to infer which of those three possibilities was true, so it would have been speculative to ascribe any probative value to appellant's comments. (See *People v. Cowan* (2010) 50 Cal.4th 401, 473 (*Cowan*) [the defendant's offer to speak to the police lacked probative value because "there are numerous plausible reasons why a guilty person might offer to talk to the police"].) Accordingly, because the questions lacked non-speculative probative value, they were properly excluded as irrelevant. (*Morrison*, *supra*, 34 Cal.4th at p. 711.)[12]

VI.   *No Error in Exclusion of Appellant's Assertion That His Foot Slipped*

Appellant contends the trial court erred by excluding a statement he made to emergency personnel that the crash occurred because his "foot slipped on the [brakes]." The trial court did not abuse its discretion in finding the spontaneous statement exception inapplicable.

A.   *Background*

Before trial, appellant moved to introduce evidence that, in the ambulance on the way to the hospital, emergency personnel asked him how the collision occurred and he responded, "my foot slipped on the [brakes]."

---

[12] In the alternative, the questions were properly excluded under Evidence Code section 352, because any slight probative value was outweighed by the risk of confusing the issues and undue consumption of time. (See *Cowan, supra*, 50 Cal.4th at p. 473 [the defendant's offer to speak to the police properly excluded under Evid. Code, § 352].)

26

The exchange occurred more than half an hour after the crash.  Appellant argued the evidence was admissible under the hearsay exception for spontaneous statements (Evid. Code, § 1240) because he was still under the stress of the collision and was in and out of consciousness when he made the statement.  The prosecution opposed admission of the statement, arguing appellant had time to deliberate before making his "self-serving" statement.  The prosecutor observed that appellant had already watched the victims being extracted from the grey truck, first responders believed he was "faking it" and pretending to be unconscious at times, and appellant had already given law enforcement officers competing accounts of the events.

The trial court denied appellant's motion, concluding the spontaneous statement exception was inapplicable.

B.     *Analysis*

Evidence Code section 1240 provides, "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."  " ' "To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." ' " (*People v. Thomas* (2011) 51 Cal.4th 449, 495 (*Thomas*); see

also *Morrison, supra*, 34 Cal.4th at p. 718 ["a statement may qualify as spontaneous if it is undertaken without deliberation or reflection"].)

" 'The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker.' [Citation.] 'A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was "time to contrive and misrepresent," ' such as 'the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication.' " (*People v. Mataele* (2022) 13 Cal.5th 372, 411 (*Mataele*).)

Appellant argues that the evidence of him "lapsing in and out of consciousness weighed" in favor of a finding of reliability and that the passage of time was not so much as to render the statement not spontaneous. However, the court's finding that the statement did *not* occur before appellant had " ' "time to contrive and misrepresent" ' " (*Thomas, supra*, 51 Cal.4th at p. 495) is clearly supported by the record. (See *id.* at p. 496 [" ' "[T]he discretion of the trial court is at its broadest" when it determines whether an utterance was made while the declarant was still in a state of nervous excitement.' "]; accord, *Mataele, supra*, 13 Cal.5th at p. 411.) Regardless of whether appellant was actually passing in and out of unconsciousness or only pretending to do so, there was evidence he was alert

and oriented in his communications with the first responders.[13]  There was also evidence that appellant was only selectively cooperative with the first responders, which provided further reason to be suspicious of appellant's "self-serving" statement.  (See *People v. Williams* (2006) 40 Cal.4th 287, 318–319.)  Because the record provides ample support for the trial court's finding the ambulance statement was not actually spontaneous, the court did not abuse its discretion in excluding the statement at trial.

VII.  *Any Error in Admitting Autopsy Photos Was Not Prejudicial*

Appellant contends the trial court erred in admitting four autopsy photographs of Jane Doe 1 and Jane Doe 2.  Though the disturbing photographs had virtually no probative value, it is not reasonably probable any such error affected the outcome of trial.

A.  *Background*

Before trial, the prosecution moved to admit accident scene and autopsy photographs, and appellant moved to exclude the same photographs.  At the hearing on the motions, the prosecutor stated she sought to admit three autopsy photographs each of Jane Doe 1 and Jane Doe 2, and she provided alternatives for the trial court to choose from.  She argued the photographs were relevant because they showed the victims' injuries that resulted in their deaths.  As to Jane Doe 1, the prosecutor explained that two of the photographs showed flecks of paint on Jane Doe 1's body, which showed "the intrusion of the truck—into the [victims'] car."  Another photograph was a "silhouette" showing "that her face was fractured severely

_____

[13] We reject appellant's assertion that the trial court "arbitrarily reasoned that appellant's statement could not be trusted regardless of his physical and mental state at the time he made it."  Instead, the court found the statement did not fall within the scope of the exception, even if appellant was actually coming in and out of unconsciousness.

29

in a concave fashion." And two other photographs showed the injury to the back of Jane Doe 1's head. As to Jane Doe 2, the prosecutor explained that one photograph showed her condition on arrival at the coroner's office, another showed her head trauma before any work was done by the coroner, and a third (and alternatives) showed the trauma to Jane Doe 2's brain.

Appellant's counsel argued that the photographs were irrelevant and "extremely prejudicial," and that their admission would serve "no purpose other than to shock the jury."

The trial court admitted three of the photographs of Jane Doe 1 and one of Jane Doe 2. As to Jane Doe 1, the court admitted a photograph "showing the debris, the flakes, the transfer from the truck;" a photograph that showed the paint flakes "but also the concave damage to the child's face;" and a photograph showing the injury that caused Jane Doe 1's death. As to Jane Doe 2, the court allowed a photograph showing her injuries.

B.    *Analysis*

" ' "The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]" [Citation.] "[A] court may admit even 'gruesome' photographs if the evidence is highly relevant to the issues raised by the facts, or if the photographs would clarify the testimony of a medical examiner." [Citation.] "We have consistently upheld the introduction of autopsy photographs disclosing the manner in which a victim was wounded as relevant not only to the question of deliberation and premeditation but also aggravation of the crime and the appropriate penalty. . ." ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1272

30

(*Gonzales*).) Autopsy and crime scene photographs are not subject to exclusion simply because cause of death is undisputed; even where cumulative, such photographs may be admitted "to illustrate the testimony of the pathologist and to corroborate other evidence." (*People v. Winbush* (2017) 2 Cal.5th 402, 459.)

Nevertheless, in the prior cases that have upheld admission of very gruesome photographs of victims, the photographs have had specific probative value to the People's theory of the case. (See, e.g., *People v. Johnson* (2015) 61 Cal.4th 734, 767 ["the photographs were relevant to show the conditions of the bodies and the directions of the bullets as indicated by the coroner in the photographs" and "to establish that [a victim] had been beaten and dragged for purposes of the robbery and kidnapping special circumstances"]; *People v. Booker* (2011) 51 Cal.4th 141, 171 ["many of the photographs highlighted the attacks on the victims' throats, which tended to prove an intent to kill. . . . The photographs also supported the prosecutor's argument that the same person committed all of these crimes" and that murders occurred during commission or attempted commission of rape]); *People v. Mills* (2010) 48 Cal.4th 158, 192 ["The photographs and the edited videotape tended to prove such unpleasant but relevant details as the cleanliness of the wound . . ., the depth of the wound (suggesting the amount of force used). . ., the position of the body and the condition of the victim's clothes (which might be relevant to the existence of consent), and whether penetration with the bottle occurred before death (based on the amount of blood produced)."]; *People v. Riggs* (2008) 44 Cal.4th 248, 304 ["[t]hese photographs were admissible to establish that the murder was premeditated and deliberate"]; *People v. Crittenden* (1994) 9 Cal.4th 83, 134 [among other things, photographs "were highly probative as to the kind and degree of force

31

used on the victims, indicative of malice, and . . . to establish the intent to cause cruel suffering and the causation of extreme pain"].)

In the present case, respondent argues that, in addition to providing corroboration of the testimony regarding the victims' cause of death, "the severity of the fatal collision caused by appellant's driving was probative on the issue of implied malice." Of course, there was a great deal of other evidence demonstrating the severity of the crash, including the coroner's testimony, the detailed testimony about and photographs of the condition of both trucks after the collision, and the testimony that the collision "sounded like a bomb went off." Among other things, the crash reconstruction expert opined that the damage to the trucks showed a "heavy front-end collision" that occurred with "very great force." Accordingly, the photographs of the victims were at best highly cumulative on the question of the severity of the impact.

More fundamentally, it is difficult to discern any *reasonable inference* the jurors could make on the question of implied malice from the victims' injuries. The jurors had no basis to draw any conclusions about the force of the collision, much less about appellant's driving, from the specifics of the victims' injuries. For example, though the injuries suggested the collision was forceful, there was no basis for the jurors to infer from those injuries specific information about the speed of the vehicle, or whether appellant was braking or trying to avoid the collision. Notably, there was testimony the white truck was particularly large and heavy. The jury could make no non-speculative inference from the injuries regarding the particularities of appellant's driving, beyond the fact that it was not a low-speed collision.

As noted previously, "Evidence is relevant if it 'tends "logically, naturally, and by reasonable inference" to establish material facts such as

32

identity, intent, or motive. [Citations.]' [Citation.] Evidence is irrelevant, however, if it leads only to speculative inferences." (*Morrison, supra,* 34 Cal.4th p. 711.) Under California Supreme Court authority, the autopsy photographs had some very modest probative value to corroborate the testimony about cause of death, even though that issue was undisputed and the evidence was cumulative. But the photographs appear to be *irrelevant* on the subject of implied malice.

In analyzing whether the photographs should have been admitted under Evidence Code section 352, the only probative value properly weighed in favor of admission was the slight probative value of cumulative, corroborating evidence on the undisputed issue of the victims' cause of death. On the other hand, the profoundly disturbing photographs—of two toddlers with their heads smashed in—were highly inflammatory. Moreover, the inflammatory impact was not simply due to a depiction of appellant's crimes—the charged offense alleged that appellant drove with an abandoned and malignant heart, not that he intentionally bashed in the heads of the two dead victims. (Cf. *Gonzales, supra,* 54 Cal.4th at p. 1272 ["The photographs at issue here are gruesome because the charged offenses were gruesome, but they did no more than accurately portray the shocking nature of the crimes."].) The photographs accurately depicted the tragic *consequences* of appellant's behavior, for which he was properly convicted of murder under a theory of implied malice. But, by viscerally reminding the jury of the physical harm inflicted on victims of such a tender age with no apparent probative purpose specific to the prosecution's theory of the case, the primary effect of the photographs in the present case was to "unnecessarily play upon the emotions of the jurors." (*Ibid.*)

In any event, even if admitting the photographs was erroneous, the ruling was not prejudicial; it is not " 'reasonably probable' " the erroneous admission of the photographs prejudiced appellant, even considered in conjunction with the erroneous admission of his prior driving offenses.[14] (*People v. Carter* (2005) 36 Cal.4th 1114, 1171.) Although the photographs were disturbing, there were only four and they were not emphasized in the closing arguments. The evidence supporting the finding of implied malice was strong, and the jury learned in detail about the nature of the girls' fatal injuries from the other graphic testimony at trial. (See *ibid.* ["[t]he photographic evidence at issue did not disclose to the jury any information that was not presented through the testimony of witnesses"].) In light of the nature of the crime and its devastating consequences to the two victims and their mother, there is no reasonable likelihood that viewing the four photographs had a material, additional emotional impact on any juror.[15] Appellant has not shown any error in admitting the photographs was prejudicial.

VIII. *Insufficient Evidence Supports the Evading Conviction*

Appellant contends insufficient evidence supports the conviction for evading a police officer causing injury. We agree.

A conviction under Vehicle Code section 2800.3 requires that a defendant proximately cause serious bodily injury while evading a police

_____

[14] Accordingly, we reject appellant's claim of cumulative error. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646.) We also reject appellant's claim that any error in admission of the photographs deprived him of a fair trial and must be reviewed for prejudice under the standard for federal constitutional error.

[15] The jury was instructed not to "let bias, sympathy, prejudice, or public opinion influence [its] decision." We presume the jury followed that instruction. (*People v. Parker* (2022) 13 Cal.5th 1, 71.)

officer in violation of Vehicle Code section 2800.1. (Veh. Code, § 2800.3, subd. (a); *People v. Brown* (1989) 216 Cal.App.3d 596, 599.) To prove a violation of Vehicle Code section 2800.1, the People must show (in addition to other elements) that the pursuing police vehicle "exhibit[ed] at least one lighted red lamp visible from the front and the [defendant] either [saw] or reasonably should have seen the lamp." (Veh. Code, § 2800.1, subd. (a).) Appellant argues there is insufficient evidence he saw or reasonably should have seen the lamp on Deputy Valentine's patrol car because the collision occurred seconds after the deputy turned on the lights and sirens.[16]

We agree. Deputy Valentine did not turn on the lights or siren until appellant turned off the highway down an embankment, the collision occurred only two to five seconds later, the deputy testified he was 15 car lengths behind at that moment, and there is no evidence appellant looked back or should have heard the sirens at that distance. The circumstance that it appeared appellant accelerated down the ramp to effectuate his escape did not permit an inference he did so in response to the patrol car's light, given that appellant had already demonstrated an intent to escape by veering down the embankment. Viewing the record in the light most favorable to the verdict (*People v. Hubbard* (2016) 63 Cal.4th 378, 392), there still was no evidence from which a jury reasonably could have inferred that appellant "either [saw] or reasonably should have seen the lamp." (Veh. Code, § 2800.1, subd. (a).) The conviction must be reversed.

---

[16] While appellant also initially argued there was insufficient evidence Deputy Valentine turned on the patrol car's red light and siren, he concedes in his reply brief there was sufficient evidence the light was turned on, and he appears to no longer contend there was insufficient evidence the siren was turned on.

## DISPOSITION

The conviction on count three, for evading a police officer causing injury (Veh. Code, § 2800.3, subd. (a)), is reversed.  The jury's verdicts are otherwise affirmed.  The matter is remanded for resentencing.

_____
SIMONS, J.

We concur.

_____
JACKSON, P. J.

_____
LANGHORNE, J.*

(A160851)

_____

\* Judge of the Napa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## People v. Saucedo (A160851)

Trial Judge:      Hon. Anita L. Santos

Trial Court:      Contra Costa County Superior Court

Attorneys:

      Law Office of Steven Schorr, Steven Schorr, under appointment by the First District Appellate Project, for Defendant and Appellant.

      Rob Bonta, Attorney General of California, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, Melissa A. Meth, Deputy Attorney General, and Amit Kurlekar, Deputy Attorney General, for Plaintiff and Respondent.